▮ THE PEOPLE OF THE STATE OF NEW YORK et al., Appellants, v BROOKLYN PSYCHOSOCIAL REHABILITATION INSTITUTE et al., Respondents.—In an action, inter alia, to enjoin the defendants from operating certain mental health facilities and to recoup public and residents' funds allegedly misappropriated by the defendants through Medicaid and real estate fraud, the plaintiffs appeal from (1) an order of the Supreme Court, Kings County (Ventiera, J.H.O.), dated May 6, 1991, which, after a nonjury trial, directed that the complaint be dismissed and severed the claims of the defendants 3 Lafayette Avenue Corporation and Cobble Hill Center Corporation to recover unpaid rent from a court-appointed receiver, (2) an order of the same court, also dated May 6, 1991, which, inter alia, added the receiver as a party to the severed action, directed that interest be added to the rent to be paid by the receiver, and directed that a posttrial hearing be held on the issue of the market rental value of the facilities utilized by the receiver, and (3) a judgment of the same court, entered June 5, 1991, which dismissed the plaintiff's complaint in the original action.

Ordered that the first order dated May 6, 1991, is modified

by striking therefrom the provision directing a severance and the portion thereof which dismissed the complaint insofar as it is asserted against the defendant Karl Easton; as so modified, the first order dated May 6, 1991, is affirmed; and it is further,

Ordered that the second order dated May 6, 1991, is modified, on the law, by deleting the third decretal paragraph thereof; as so modified, the second order dated May 6, 1991, is affirmed; and it is further,

Ordered that the judgment is modified by (1) adding thereto a provision awarding judgment in favor of the plaintiffs and against the defendant Karl Easton in the principal sum of $7,573,703, representing the proceeds of Medicaid fraud and treble damages pursuant to Social Services Law § 145-b, (2) adding thereto a provision awarding judgment in favor of the defendants 3 Lafayette Avenue Corporation and Cobble Hill Center Corporation and against the receiver Federation Employment Guidance Service, in the principal sum of $38,708, and (3) adding to the first decretal paragraph thereof, after the phrase "hereby is dismissed" the words "in all other respects"; as so modified, the judgment is affirmed; and it is further,

Ordered that the plaintiffs are awarded one bill of costs payable by the defendant Karl Easton.

The evidence established that Dr. Karl Easton controlled the Brooklyn Psychosocial Rehabilitation Institute (hereinafter BPRI), a not-for-profit corporation, which offered services to the mentally ill. The Easton family also controlled BPRI's landlords, Cobble Hill Center Corporation (hereinafter CHCC) and 3 Lafayette Avenue Corporation (hereinafter 3LAC), which owned the premises leased to BPRI, housing its two facilities. These facilities included: (1) the Boerum Hill Community Residence (hereinafter BH), a supervised community residence for mentally disabled persons located at 50 Nevins Street, Brooklyn, which rented its premises from CHCC and housed 196 mentally disabled individuals, and (2) The Lafayette Center (hereinafter TLC), a continuing treatment outpatient program located some two blocks from BH at 3 Lafayette Avenue, Brooklyn, and which leased its property from 3LAC. Also affiliated with BPRI and rented from CHCC were the "Satellite Apartments", located at 415, 417, and 419 State Street, Brooklyn, where resided less mentally disabled persons who were capable of some degree of independent living but still required intermittent supervision. These facilities were licensed by the New York State Office of Mental Health

(hereinafter OMH), and were funded by both Medicaid and Social Security. In their complaint, the plaintiffs charged, *inter alia,* that Easton defrauded Medicaid by improperly billing for "home visits" that were either not reimbursable or not performed. Indeed, they alleged that in 1985, for example, 95% of all "home visits" reimbursed by Medicaid State-wide were paid to BPRI.

The instant action was commenced by service of a summons and complaint on or about October 20, 1986. The trial consumed several days over a 10-month period. Following trial, J.H.O. Ventiera dismissed the complaint, while severing for a further hearing the claims for rent by the defendants 3LAC and CHCC against the court-appointed receiver, Federation Employment Guidance Service (hereinafter FEGS), for the period from October 20, 1986, to April 19, 1988, when the State took title by condemnation. On August 2, 1991, the rent hearing was stayed by this court pending determination of the instant appeal.

We find that the plaintiffs carried by overwhelming evidence their burden of proving that the defendants fraudulently billed Medicaid for "home visits" that were not actually performed, as the patient-staff interactions reported as BPRI "home visits" did not satisfy the Medicaid regulations and guidelines.

A "home visit" to a psychiatric patient by a qualified member of a clinical facility is contemplated by the OMH regulations and guidelines to be a rare event, to be provided in the patient's home environment when he is for some reason unable to attend the regular clinic or day treatment center. According to 14 NYCRR former 579.5 (e) (eff Aug. 10, 1982, repealed Apr. 5, 1988): "Services may be provided to patients at a location away from the [clinic] facility. Except for crisis services, the patient's treatment plan must include the location where off-site services will be provided and justify the need for such off-site services. Reimbursable off-site services shall be limited to assessment and treatment planning services, verbal therapies, medication therapy, crisis services, and case management services". A "home visit" is required to be at least 30 minutes in duration (14 NYCRR former 579.6 [a] [5]; [b] [5]; [c] [5] [eff Aug. 10, 1982, repealed Apr. 5, 1988]).

In late 1984 and early 1985, the defendant Dr. Easton initiated a new "home visit" policy at BPRI, according to which every casual contact between *any* BPRI employee and a client occurring off the clinic premises was to be recorded in a

log as a "home visit". The plaintiffs proved that the enormous quantity of "home visits" billed to Medicaid by BPRI between January 1985 and October 1986 was directly traceable to this new "home visit" policy. Thus, the plaintiffs' witnesses testified that Easton insisted that all BPRI staff—including regular BH employees, whose *ordinary* job it was to wake up the residents, interact with them, motivate them, etc.—enter each of their routine and casual contacts with patients as "home visits". These "home visits", as recorded in BPRI's "home visit logs" after December 1984, failed to conform to Medicaid's definition of "home visits" for the following reasons: (1) they were done routinely rather than when patients were temporarily homebound, (2) they were performed in BH, a residence facility (i.e., a regular work location) rather than at the patient's home, (3) they were performed by regular BH floor staff rather than by qualified clinical therapists, (4) they were casual social contacts rather than contacts for the purpose of providing therapeutic services, (5) they were not therapeutically "justified", (6) they were not documented, (7) their duration was not recorded, (8) they did not last (and could not be aggregated to) the requisite 30-minute minimum, and (9) each individual participating in a group activity was deemed to have had a "home visit", when a proper "home visit" was one-on-one.

The record does not support the defendants' contention that there was no relationship between those "home visits" recorded on the "home visit logs" and those billed to Medicaid. "Home visits" which were recorded on the "home visit logs" were then reported on the work sheet of the case manager responsible for that patient, as if the case manager had performed the visit himself. Also entered on the case manager's work sheet were all of the other services and attentions paid to that case manager's patients for that week. When the case manager's work sheet was sent to billing, the result was that *something* was billed to Medicaid for every patient for every day, although the facility could not bill *everything* entered on its in-house sheets without being in conspicuous violation of the Medicaid regulations. Thus, the evidence at trial established that if a patient was recorded as spending a full day ("F"), for example, at the clinic, *and* that patient was recorded as having received one or more "home visits" ("HVs") on the same day, the facility would bill Medicaid for an F rather than an HV.

Because there were, inevitably, more HVs entered on BPRI's home visit logs than were billed to Medicaid (since

OMH regulations forbade more than one HV per day to the same patient), the defendants argued that they only *billed* "home visits" when the number of short contacts with a patient over the course of a day *added up* to a minimum of 30 minutes. Aside from the fact that—despite the Supreme Court's finding to the contrary—the regulations do not permit such an accumulation of home visit time, the plaintiffs' investigation showed that in some 72% of cases a "home visit" was traceable to *one* or *no* staff-to-client contact, while another 6% were undocumented.

The record thus reflects that between January 1985 and October 1986, through a scheme devised and implemented by Dr. Karl Easton, BPRI received $2,524,501 in public funds for "home visits" that did not qualify for reimbursement under the OMH regulations.

Social Services Law § 145-b (2) places personal liability on any individual who "knowingly by means of a false statement or representation, or by deliberate concealment of any material fact" falsely obtains—or attempts to obtain—public funds, "on behalf of himself or others". Where public welfare benefits are obtained fraudulently by an entity (e.g., BPRI), the individual supervising, overseeing, performing or conspiring to effectuate the fraudulent acts can be held personally responsible, and is liable for treble damages *(see, State of New York v Britt,* 141 AD2d 911; *see also, United States v Weiss,* 914 F2d 1514, 1526, *cert denied sub nom. Gleicher v United States,* — US —, 111 S Ct 2888; *United States v Brown,* 763 F2d 984, 992, *cert denied* 474 US 905; *Harvey-Cook v Miroff,* 130 AD2d 621; *Harvey-Cook v Steel,* 124 AD2d 709, 710). It is clear from the trial testimony that Easton designed, supervised, and implemented BPRI's "home visit" billing fraud on Medicaid.

Moreover, the plaintiffs proved that this fraud inured to the benefit of Easton and his family. BPRI's leases with Easton's realty corporations contained steep escalation clauses and so-called "net net" provisions, obligating the *tenant* to pay all taxes, expenses, repairs, etc. Such leases were *per se not negotiated at "arms length,"* as Department of Health (hereinafter DOH) expert David Hodgkins found, because Easton himself was controlling the bargaining on both sides of the bargaining table, in his not-for-profit capacity as Medical Director of BPRI, and his for-profit role as ultimate owner of CHCC and 3LAC *(see, Matter of Cantor v Axelrod,* 63 NY2d 965; *Matter of White Plains Nursing Home v Axelrod,* 131 AD2d 24, 25). Through Easton's de facto control of the two realty corporations, which were ostensibly owned by his chil-

dren, the family was personally enriched when the funds collected from the Medicaid fraud were paid in the form of grossly inflated rents.

In addition, because the leases were not negotiated at arms length, the court erred in determining that the so-called Medicaid "cap" did not apply to the rents during the receivership period. Mental Hygiene Law § 31.28 (b) (4), which was patterned on the receivership statute of the DOH, Public Health Law § 2810 (2) (b) (see, L 1984, ch 863, mem of Office of Mental Health) provides that if the leases to mental health community residences were negotiated at arms length, the rents contained therein would apply during a receivership period. If, on the other hand, they were not negotiated at arms length, the landlord is entitled to either the so-called Medicaid "cap" or the "fair monthly rental", whichever is lower (see, Mental Hygiene Law § 31.28 [b] [4]; Public Health Law § 2810 [2] [b]). Since the leases were not negotiated arms length, they should have been disregarded. Consequently, the Medicaid amounts ("the amount which would be reimbursable to the facility under the medical assistance program for real property costs if each patient in the facility were a recipient of medical assistance" [Mental Hygiene Law § 31.28 (b) (4)]), as computed and testified to by DOH expert Hodgkins (according to a formula derived from 10 NYCRR 86.2), should have been applied because they were lower than the stipulated "fair market rentals". By Hodgkins' computation, the Medicaid "cap" for both facilities together was $19,806 for 1986 and $18,902 for 1987.

We have considered the plaintiffs' remaining contentions and find that the further relief sought is not warranted on the record of these proceedings. Bracken, J. P., Lawrence, Ritter and Copertino, JJ., concur.