*283 OPINION OF THE COURT
Joseph Harris, J.
Plaintiff State of New York (State) has instituted this action against two corporations — Cobble Hill Center Corp. (CHCC) and 3 Lafayette Avenue Corp. (3LAC) — seeking to hold them liable for, and to enforce, a final judgment of over $7.5 million obtained against their president, defendant Karl Easton (Easton) — who is not a shareholder of the corporations — representing the proceeds of Medicaid fraud and treble damages established in People v Brooklyn Psychosocial Rehabilitation Inst. (185 AD2d 230 [2d Dept 1992], lv denied 81 NY2d 702, cert denied sub nom. Easton v New York, 510 US 862).
In the instant action the State contends that defendant Easton exercised complete domination and, control over CHCC and 3LAC and used said real estate corporations to fraudulently enable him to obtain and conceal public Medicaid monies, that CHCC and 3LAC have no will or existence of their own, and never had such will or existence separate and independent of defendant Easton, but are, and always have been, mere instrumentalities, agents, alter egos and facades of defendant Easton, that defendant Easton’s relationship with CHCC and 3LAC at all times was an attempt to erect a corporate veil behind which defendant Easton’s personal transactions, obligations and unlawful conduct could be concealed, and that, "[Defendants CHCC and 3LAC should, therefore, be held responsible and liable for the debts of defendant Easton.” (See, complaint para 22.)
Defendants assert that plaintiff’s complaint is framed solely as an action to pierce the corporate veil in reverse, and limited to same, i.e., to disregard the corporate form and hold CHCC and 3LAC liable for Easton’s debt because they are the alter ego instrumentalities of Easton with no separate existence of their own — a departure from "traditional” piercing in which the corporate form is disregarded and the individual owners are held liable for the debts of the corporation (see, Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135). This assertion is unfounded and deceptively obfuscates the relevant and material issues herein. In reality, piercing of the corporate veil is not an independent action but a procedural device to secure separately existing substantive rights owing to the plaintiff. In the instant case plaintiff seeks two alleged substantive rights for which the defendant corporations are either responsible for payment or independently liable — the for *284 mer derivative from the initial fraud of defendant Easton as established in People v Brooklyn Psychosocial Rehabilitation Inst, (supra), the payment of which the defendant corporations are responsible by reason of being the alter ego of defendant Easton, and the other constituting an independent liability on the part of the corporate defendants for conspiracy and fraud in acting, so to speak, as a "laundry”, and allowing itself to be so used, to conceal and distribute the ill-gotten gains of Dr. Easton as established in People v Brooklyn Psychosocial Rehabilitation Inst. (supra), and to act as a conduit to transfer these proceeds and other personal assets of Dr. Easton and his wife in a fraudulent effort to prevent rightful recoupment by the State.
Labels elevate form over substance and erect barriers to obstruct equity from performing its salutary duty — to do justice. Thus, whether the issues herein ought to be compacted into the form of an action to pierce the corporate veil, or into an action for independent fraud on the part of the real estate corporations, as described above, labels have a tendency to obfuscate the true and real interrelationships that characterize the above concepts and the issues of this case. More meaningful is the definition of a cause of action as "a set of operative facts that gives rise to the legal or equitable right of an aggrieved to seek a remedy.” (See, Matter of Schultz v Town of Kingsbury, Sup Ct, Albany County, Apr. 1, 1994, Harris, J.)
The State moves for summary judgment and for an order dismissing defendants’ counterclaim for failure to state a cause of action; the defendants move for summary judgment on their counterclaim, alleging failure of the plaintiff to state a cause of action, res judicata, collateral estoppel, judicial estoppel, laches, and Statute of Limitations, and for dismissal of the complaint in its entirety.
BACKGROUND
Easton has been the president of CHCC and 3LAC (also referred to as the defendant corporations) since he formed them in 1966 and 1967. He and his three infant children owned all of the shares of CHCC until shortly after incorporation when he transferred his shares to the infant children who since then, and now, own all of said shares. CHCC owns all of the shares of 3LAC. The corporations owned various proper *285 ties, inter alia, in Brooklyn, New York[1] which they leased to Brooklyn Psychosocial Rehabilitation Institute (BPRI), a not-for-profit corporation which ran facilities funded by Medicaid and Social Security and approved by the Office of Mental Health (O.M.H.), offering services to the mentally ill. Easton was Medical Director of BPRI. In 1986, the State (including O.M.H. and the Department of Social Services [D.S.S.]) brought charges against BPRI, 3LAC, CHCC, Easton and others essentially for defrauding Medicaid by improperly billing for "home visit” services that were not reimbursable under the regulations of the New York State Office of Mental Health, or not performed. As relevant here, the complaint charged Easton, BPRI and the corporate defendants with fraudulently operating BPRI and its facilities in violation of the Social Services Law, Mental Hygiene Law and implementing regulations, the Social Security Act, the Executive Law and Not-For-Profit Corporation Law. After a nonjury trial, Supreme Court, Kings County (Ventiera, J.H.O.), entered judgment dismissing the complaint in its entirety.[2] The Second Department modified, by reversing the dismissal of charges as against Easton, and awarding judgment in favor of the State and against Easton in the principal sum of $7,573,703, representing the proceeds of Medicaid fraud in the sum of $2,524,501 and treble damages per Social Services Law § 145-b[3] (see, People v Brooklyn Psychosocial Rehabilitation Inst., 85 AD2d, at 231, supra). The Second Department affirmed the dismissal of all other charges against all other defendants including the corporate defendants CHCC and 3LAC, finding in relevant part as follows (at 231-235):
"The evidence established that Dr. Karl Easton controlled the Brooklyn Psychosocial Rehabilitation Institute (hereinafter BPRI), a not-for-profit corporation, which offered services to *286 the mentally ill. The Easton family also controlled BPRI’s landlords, Cobble Hill Center Corporation (hereinafter CHCC) and 3 Lafayette Avenue Corporation (hereinafter 3LAC), which owned the premises leased to BPRI, housing its two facilities * * *
"We find that the plaintiffs [State of New York and its relevant agencies] carried by overwhelming evidence their burden of proving that the defendants fraudulently billed Medicaid for 'home visits’ that were not actually performed, as the patient-staff interactions reported as BPRI 'home visits’ did not satisfy the Medicaid regulations and guidelines * * *
"The record thus reflects that between January 1985 and October 1986, through a scheme devised and implemented by Dr. Karl Easton, BPRI received $2,524,501 in public funds for 'home visits’ that did not qualify for reimbursement under the OMH regulations. [Increased to $7,573,703 under the treble damages provisions of Social Services Law § 145-b.] * * *
"It is clear from the trial testimony that Easton designed, supervised, and implemented BPRI’s 'home visit’ billing fraud on Medicaid.
"Moreover, the plaintiffs proved that this fraud inured to the benefit of Easton and his family. BPRI’s leases with Easton’s realty corporations contained steep escalation clauses and so-called 'net-net’ provisions, obligating the tenant to pay all taxes, expenses, repairs, etc. Such leases were per se not negotiated at 'arms length’ * * * because Easton himself was controlling the bargaining on both sides of the bargaining table, in his not-for-profit capacity as Medical Director of BPRI, and his for-profit role as ultimate owner of CHCC and 3LAC (see, Matter of Cantor v Axelrod, 63 NY2d 965; Matter of White Plains Nursing Home v Axelrod, 131 AD2d 24, 25). Through Easton’s de facto control of the two realty corporations, which were ostensibly owned by his children, the family was personally enriched when the funds collected from the Medicaid fraud were paid in the form of grossly inflated rents.”
The claims against the realty corporations for the fraudulent "home visit” payments (hereinafter referred to as the initial fraud) were dismissed. This is an obvious result of the fact that the initial fraud perpetrated by Easton — the "home visit” fraud — was what might be denominated an "operating” fraud, designed and supervised by Easton and implemented by the operating company BPRI. In this initial fraud the realty corporations, CHCC and 3LAC, did not participate. It was a subsequent or secondary fraud that the realty corporations *287 participated in — the concealment and laundering of the fraudulent proceeds obtained by the "home visit” fraud, and the shielding of these proceeds, as well as the personal assets of Dr. Easton and his wife, from recoupment by the State. Not only were the realty corporations a laundry for "dirty” proceeds, they were a bank in which to hide these proceeds during the cleansing process.
EMINENT DOMAIN CPLR ARTICLE 78 PROCEEDINGS
In 1986 the State acquired — pursuant to its eminent domain powers — the property owned by the corporate defendants (CHCC and 3LAC) in Kings County. The State Comptroller refused to pay the corporate defendants for the appropriation, claiming entitlement to a setoff based upon the State’s potential recovery against Easton in the then-pending case of People v Brooklyn Psychosocial Rehabilitation Inst. (supra). Shortly after the Second Department held Easton liable for Medicaid fraud (supra), the Third Department upheld the Comptroller’s discretionary refusal to pay the corporate defendants for the appropriated property based upon his " ' "right to offset any valid claim of the State against one [i.e., Easton] to whom money under his control is due from the State” ’ ” (Matter of 3 Lafayette Ave. Corp. v Comptroller of State of N. Y., 186 AD2d 301, 303 [3d Dept 1992] [citations omitted], lv denied 81 NY2d 705, rearg denied 82 NY2d 706).
THE LAW
Piercing of the Corporate Veil
The general rules governing the concept of "piercing the corporate veil” were most recently set forth in Matter of Morris v New York State Dept. of Taxation & Fin. (82 NY2d 135, 140-141, supra):
" 'Broadly speaking, the courts will disregard the corporate form, or, to use accepted terminology, "pierce the corporate veil”, whenever necessary "to prevent fraud or to achieve equity.” ’ [Citations omitted.]
"The concept of piercing the corporate veil is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners [citations omitted]. * * *
*288 "The concept [piercing the corporate veil] is equitable in nature and assumes that the corporation itself is liable for the obligation sought to be imposed [citation omitted]. Thus, an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners. * * *
"Because a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised [citation omitted]. Generally, however, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff’s injury (see, Matter of Guptill Holding Corp. v State of New York, 33 AD2d 362, 364-365 [other citations omitted]; see generally, Presser, Piercing the Corporate Veil § 2.33 [3], at 2-304 — 2-313).”
There appears to be a consensus that the analysis does not differ as between a piercing claim framed on an instrumentality theory and one framed on an alter ego theory (see, Passalacqua Bldrs. v Resnick Dev. S., 933 F2d 131 [2d Cir 1991]). It must be emphasized that "[w]hile complete domination of the corporation is the key to piercing the corporate veil * * * such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required” (Matter of Morris v New York State Dept. of Taxation & Fin., supra, 82 NY2d, at 141-142). The burden is on the party seeking to pierce the corporate veil to "establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene” (supra, at 142; Matter of Guptill Holding Corp. v State of New York, supra, 33 AD2d, at 365).
Reverse Piercing
"Traditional” piercing is a device used to hold corporate owners (or another corporation) liable for corporate obligations (see, e.g., Passalacqua Bldrs. v Resnick Dev. S., 933 F2d 131 [2d Cir 1991], supra). "Reverse” piercing entails an effort to hold a corporation liable for the debts of its owners, as in Matter of *289 Guptill (supra) where the Third Department held that the State could not enforce against a corporation a tax lien upon a shareholder where the State had not been injured by the conduct of any corporate business.
The case sub judice adds another twist to the law of traditional piercing — the State’s attempt to hold corporations liable for a judgment debt of their dominant officer (Easton) who is not a "legal” shareholder/owner but an "equitable” one. Morris (supra) presages that this may not be impermissible (see also, Lally v Catskill Airways, 198 AD2d 643; Establissement Tomis v Shearson Hayden Stone, 459 F Supp 1355, 1366, n 13), but the parties have not cited — and indeed the court after exhaustive research has not identified — any clear authority in this State holding a corporation liable for its officers’ debts under a piercing theory, as opposed to agency or respondeat superior principles (but see, Matter of Guptill Holding Corp. v State of New York, supra). This is not surprising, because, historically, incorporation is designed to limit liability of owners of the corporation — not to limit a corporation’s liability for the acts of its officers; the whole concept of "piercing” involves going beyond the corporate form to reach the normally insulated-from-liability owners rather than, as here, pursuing the corporation itself for claims or judgments against its officers (see, Presser, Piercing the Corporate Veil § 1.01, at 1-4 — 1-5; Matter of Morris v New York State Dept. of Taxation & Fin., supra).
While there is a dearth of cases dealing specifically with the issue of "reverse” piercing — the general rule uniformly being stated that "a court will pierce the corporate veil or disregard the corporate form whenever necessary to prevent fraud or to achieve equity” (emphasis supplied) (Hyland Meat Co. v Tsagarakis, 202 AD2d 552; Billy v Consolidated Mach. Tool Corp., 51 NY2d 152; Walkovszky v Carlton, 18 NY2d 414) — conceptually "reverse” piercing is not inconsistent with nor antithetical to the salutary purposes of traditional piercing. More importantly the court has uncovered no case in which "reverse” piercing was per se rejected. (See, Matter of Guptill Holding Corp. v State of New York, supra.)
Complete domination of the corporation is the key to piercing the corporate veil, especially when the owners, legal or equitable, use the corporation as a mere device to further their personal rather than legitimate corporate business. That, without doubt, is the case here. The second prong required for opening the door is the showing of a wrongful or unjust act to *290 ward the plaintiff. That is present in the instant case in an overwhelming quantum. (See, People v Brooklyn Psychosocial Rehabilitation Inst., 185 AD2d 230, supra.) In sum, "[t]he party-seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene.” (Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 140, 142, supra; Matter of Guptill Holding Corp. v State of New York, 33 AD2d 362, 365, affd 31 NY2d 897, supra.) That ought to be the rule whether the case involves "traditional” piercing or "reverse.” The direction of the piercing is immaterial where the general rule has been met.
We must be reminded that piercing the corporate veil is not a substantive doctrine but merely a procedural device to right a wrong. An attempt of a party to pierce the corporate veil does not itself constitute an independent cause of action; "rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners” (Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141, supra).
While the court was speaking in terms of "traditional” piercing, there appears no reason why the same concept is not just as applicable to "reverse” piercing. How low would equity have fallen if, in a proper case, its application to "traditional” piercing were to be withheld, where needed, in a "reverse” piercing case?
CONCLUSION
Neither the corporate concept nor the corporate form was ever intended to enable the commission of the "perfect crime.”
Thus, in the instant case, justice requires that the principles of "traditional” piercing not be withheld from this case involving "reverse” piercing, and to hold the corporate realty defendants herein liable under a "pure” piercing theory for the judgment obtained against their sole and dominant corporate officer.
If that cannot be, the complaint contains an alternative avenue upon which plaintiff may travel to obtain the relief sought — namely, the independent (and secondary) fraud of the corporate realty defendants itself concealing and laundering the moneys fraudulently obtained by Dr. Easton by means of the initial "home visit” frauds, and other public Medicaid funds fraudulently generated by this family fraud factory in conspiracy with its patriarch and alter ego, Dr. Easton.
*291 Thus, whether one talks, with respect to Cobble Hill Center Corp., and 3 Lafayette Avenue Corp., in terms of reverse piercing of the corporate veil, alter ego, or independent fraud, these corporations are liable to the State of New York for their own illicit activity as well as that of their alter ego, Dr. Easton.
While Morris (supra) does not foreclose the possibility that the State can pursue the corporate defendants for the judgment against defendant Easton based on his status as their corporate officer who acted in that capacity (see, Cavitch, Business Organizations with Tax Planning § 103.01 et seq., § 128.06 et seq.), upon the facts and circumstances contained herein, and the law and theory stated above, such should not be necessary, and the court so holds.
The court has examined all of the other arguments of the defendant and finds them without merit.
Accordingly, for all of the above reasons, all of the defendants’ cross motions for summary judgment are denied and all of plaintiff’s motions for summary judgment are granted. Judgment in favor of plaintiff and against all defendants shall be entered in the sum of $7,573,703 together with interest from the date of the initial Medicaid fraud and the assessment of treble damages, and together with all allowable costs and disbursements.

. Prior to incorporation, the properties were owned directly by Easton.

. The unpublished decision has not been included in the papers on these motions.

. Social Services Law § 145-b provides that:
"1. It shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for services or supplies furnished or purportedly furnished pursuant to this chapter.
"2. For any violation of subdivision one, the local social services district or the state shall have a right to recover civil damages equal to three times the amount by which any figure is falsely overstated or five thousand dollars, whichever is greater.”