122 F.3d 130
 134 Lab.Cas. P 10,047
 AMERICAN FUEL CORPORATION, Robert Barra, Individually, and
Robert Ainbinder, Individually, Petitioners-Appellees,
v.
UTAH ENERGY DEVELOPMENT COMPANY, INC., Respondent-Appellant,
Robert C. Nead, JR., Respondent.
 No. 972, Docket 96-7970.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 3, 1997.
Decided Aug. 25, 1997.
 
 Barry Hunter, Brown, Todd & Heyburn, Lexington, KY (Paul E. Sullivan, Robert L. Treadway, Jr., Russell B. Morgan, of counsel), for Respondent-Appellant.
 James W. Perkins, White & Case, New York City (Karen M. Asner, Hyon J. Kim, of counsel), for Petitioners-Appellees.
 Before: WINTER, Chief Judge, CARDAMONE, Circuit Judge, and WARD*, District Judge.
 WINTER, Chief Judge:
 
 
 1
 Utah Energy Development Co., Inc. ("UEDC") appeals from Judge Sotomayor's order granting American Fuel Corporation's ("AFC") motion to compel UEDC to arbitrate UEDC's claims against AFC before the American Arbitration Association. The district court also ordered UEDC's president, Robert C. Nead, to arbitrate his claims and stayed prosecution of a lawsuit filed by UEDC and Nead against AFC in the Eastern District of Kentucky. The orders were based on an arbitration clause in an employment agreement between Nead and AFC. Although UEDC was not explicitly a party to the AFC/Nead agreement, the court held that the clause also bound UEDC to arbitration because UEDC was Nead's alter ego. UEDC seeks reversal of the district court's order to arbitrate on two grounds: (i) the district court erred in piercing the corporate veil and ordering UEDC to arbitrate its claims against AFC; and (ii) UEDC was entitled to a jury trial on the issue of whether it should be compelled to arbitrate. Because we hold as a matter of law that UEDC was not Nead's alter ego, it is not bound by Nead's arbitration agreement. In view of this disposition of the appeal, we need not reach the question of whether UEDC was entitled to a jury trial.
 
 BACKGROUND
 
 2
 In 1993, Nead and Stonie Barker formed UEDC with the intent to develop coal properties. Nead and Barker each own 50% of the stock of UEDC, although Nead claims that half of his interest is held in trust for one Lon Boggs.
 
 
 3
 AFC is a formative coal and energy recovery company with its principal offices in New York. In January 1994, AFC engaged Nead and Barker as consultants. Nead's consulting contract, renewable every two months, did not mention UEDC. Nead's primary responsibility as a consultant was to solicit new coal-investment opportunities for AFC. Barker's main responsibility was to act as AFC's agent for the sale of coal in Japan.
 
 
 4
 In late January 1994, Nead advised AFC to purchase a Utah property called the Hiawatha Mines. AFC did so in September 1994. The parties dispute the circumstances surrounding this purchase. Nead and UEDC claim that Nead presented the Hiawatha opportunity to AFC on behalf of UEDC, which had previously sought to buy the Hiawatha Mines for itself. UEDC claims that it agreed to step aside as a purchaser only in exchange for promises by AFC to use UEDC's loading services, to reserve certain portions of the Hiawatha Mines for UEDC to build a load-out facility, and to repay a $55,000 bank loan to UEDC (the "Hiawatha Agreement"). The complaint in the Kentucky action alleges that AFC also promised to employ Nead as a consultant to assist in the Hiawatha purchase. In contrast, AFC claims that Nead advised AFC to buy the Hiawatha property and disputes the existence of any agreement with UEDC.
 
 
 5
 In 1995, AFC offered Nead, Barker, and Boggs executive positions at AFC. In that connection, Nead signed an employment agreement that required him, inter alia, to arbitrate before the American Arbitration Association in New York "any controversy aris[ing] out of events or provisions related to or included within" the contract. The employment agreement provided that New York law would govern its construction and validity. However, AFC claims that Nead's employment contract was contingent on the success of a public offering that never occurred and that the agreement never became effective, notwithstanding a term of the agreement that provides for an effective date of March 1, 1995. UEDC agrees that Nead's employment agreement never became effective, although Nead, who is not a party to this appeal, may have a different view. Nead continued to work for AFC, at least as a consultant, until November 1995, when he was terminated for allegedly soliciting projects for UEDC from companies with whom he was negotiating as AFC's agent.
 
 
 6
 In January 1996, Nead and UEDC filed suit in the Eastern District of Kentucky. The complaint alleged, inter alia, that AFC breached the Hiawatha Agreement with UEDC and its employment agreement with Nead. AFC thereafter filed a petition in the Southern District of New York to compel arbitration of both Nead's and UEDC's claims pursuant to the arbitration clause in Nead's employment agreement. The district court found that the employment agreement bound Nead to arbitrate his claims because all the claims were "related to" that agreement. Although UEDC was not a party to Nead's employment agreement or even mentioned in it, the district court found that the agreement also compelled UEDC's arbitration of its contract claims against AFC because UEDC was Nead's alter ago. The court stayed prosecution of the Kentucky action pending the outcome of the arbitration.
 
 
 7
 On appeal, UEDC disputes the district court's finding of alter ego status. Nead has not appealed.
 
 DISCUSSION
 
 8
 AFC's arbitrability claim with regard to UEDC is not facially strong. The district court's order compels UEDC to arbitrate the claims it asserted in the Kentucky action. Although the parties treat the matter only obliquely, much of the present dispute, therefore, turns on a reading of the complaint filed jointly by Nead and UEDC in the Kentucky action. In AFC's view, as expressed in a single sentence in its brief, the complaint alleges that UEDC seeks damages for, inter alia, AFC's breach of its employment contract with Nead. Appellees' Br. at 19. UEDC responds only by stressing that it is not a party to that agreement and is thus not bound by its arbitration clause. The nature of UEDC's claims in the Kentucky action is not unimportant because while UEDC might arguably be bound to arbitrate a claim asserted in its own right for damages suffered from a breach of the employment agreement, it is certainly not bound to arbitrate its claims for not being cut in on the Hiawatha mining operations or for AFC's failure to repay the $55,000 bank loan owed by UEDC, unless it is asserting the claims as Nead's alter ego. Even then, the claims would have to be founded on the employment agreement and its breach.
 
 
 9
 We do not view the Kentucky complaint as asserting a claim by UEDC in its own right for AFC's alleged breach of Nead's employment agreement. First, in the only count of the Kentucky complaint that explicitly seeks damages for breach of the employment agreement, Nead alone is mentioned as a plaintiff. Although the complaint asserts various legal theories to support a recovery by UEDC--breach of contract, breach of fiduciary duty, estoppel, and fraudulent misrepresentation--it is not fairly read as including claims by UEDC other than those stemming from AFC's breach of the alleged contract to cut UEDC in on the Hiawatha mining operations and to repay UEDC's bank loan in exchange for UEDC's refraining from its efforts to buy the property. Indeed, the complaint alleges nothing that would support a claim in its own right for damages for breach of Nead's employment contract.[1] Second, UEDC's insistence from the very beginning of the present action that it is not a party to Nead's employment agreement is itself a denial, binding in this and the Kentucky action, that it seeks damages for breach of that agreement.
 
 
 10
 Therefore, the only theory on which UEDC can be compelled to arbitrate is that it is asserting breach of contract claims regarding the purchase of the Hiawatha property as Nead's alter ego and that because Nead is bound to arbitrate under the employment agreement, so is UEDC. All this assumes that the dispute over whether AFC promised to cut UEDC in on the Hiawatha mining operations is within the arbitration clause of Nead's employment agreement as a "controversy aris[ing] out of events ... related to" that agreement. However, we need not reach that issue.
 
 
 11
 UEDC resists arbitration based on the principle that a party cannot be compelled to arbitrate unless it has agreed to do so. United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960) ("a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"). Nevertheless, a "nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.' " Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir.1995) (quoting McCallister Bros., Inc. v. A & S Transp. Co., 621 F.2d 519, 524 (2d Cir.1980)); see also Interbras Cayman Co. v. Orient Victory Shipping Co., 663 F.2d 4, 7 (2d Cir.1981) (per curiam) (granting trial on whether alleged principal-agent relationship bound nonsignatory party to arbitration agreement). In Thomson-CSF, we recognized that piercing the corporate veil between a signatory and nonsignatory party may bind the nonsignatory party to an arbitration agreement of its alter ego. 64 F.3d at 776.
 
 
 12
 Amidst their disagreements, the parties agree that UEDC cannot be compelled to arbitrate unless we uphold the district court's ruling that UEDC was Nead's alter ego for purposes pertinent to this proceeding. We believe, however, that ruling must be reversed.
 
 
 13
 In a diversity case, we apply the choice of law rules of the forum state--in this case New York--to determine what law governs alter ego or piercing the corporate veil analysis. See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 137 (2d Cir.1991). However, where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry. See Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir.1989); Matter of Holborn Oil Trading Ltd. and Interpetrol Bermuda Ltd., 774 F.Supp. 840, 843 (S.D.N.Y.1991). UEDC was incorporated under Utah law, but the parties' briefs rely primarily on New York law for the veil-piercing analysis. At oral argument, both parties stressed that the law of New York and Utah is virtually identical regarding piercing of the corporate veil, and we follow their lead.
 
 
 14
 New York law requires the party seeking to pierce a corporate veil to make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. Morris v. New York State Dep't of Taxation & Fin., 82 N.Y.2d 135, 603 N.Y.S.2d 807, 810-11, 623 N.E.2d 1157, 1160-61 (1993) (citing cases). "While complete domination of the corporation is the key to piercing the corporate veil, ... such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the party seeking piercing] is required." Id. at 811, 623 N.E.2d at 1161 (citing Walkovszky v. Carlton, 18 N.Y.2d 414, 276 N.Y.S.2d 585, 587, 223 N.E.2d 6, 8 (1966); Guptill Holding Corp. v. State, 33 A.D.2d 362, 307 N.Y.S.2d 970, 972-73 (1970), aff'd, 31 N.Y.2d 897, 340 N.Y.S.2d 638, 292 N.E.2d 782 (1972)). Typically, piercing analysis is used to hold individuals liable for the actions of a corporation they control. However, New York law recognizes "reverse" piercing, which, as here, seeks to hold a corporation accountable for actions of its shareholders. See State v. Easton, 169 Misc.2d 282, 647 N.Y.S.2d 904, 908-09 (Sup.Ct.1995).
 
 
 15
 The district court found that AFC met both prongs of the test for piercing the corporate veil by showing that UEDC did not "function as a distinct entity" from Nead and that Nead used UEDC's corporate form to wrongfully evade his arbitration agreement.[2] We disagree.
 
 
 16
 The evidence AFC presented in support of the first prong of the veil-piercing test--Nead's domination of UEDC--is not sufficient. In Passalacqua, 933 F.2d 131, we enunciated a list of factors that tend to identify a dominated corporation: (1) whether corporate formalities are observed, (2) whether the capitalization is adequate, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) whether there is overlap in ownership, officers, directors, and personnel, (5) whether the corporate entities share common office space, address and telephone numbers, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the alleged dominator deals with the dominated corporation at arms length, (8) whether the corporation is treated as an independent profit center, (9) whether others pay or guarantee debts of the dominated corporation, and (10) whether the corporation in question had property that was used by the alleged dominator as if it were the dominator's own. Id. at 139.
 
 
 17
 The district court based its finding of domination primarily on UEDC's failure to observe corporate formalities and on Nead's role as UEDC's President in pursuing the Kentucky action. It is true that UEDC had no contracts, no employees, and no independent office space. The address on UEDC's letterhead was Nead's home address. UEDC had no separate bank account. It had no capital or assets at the time of trial, although it once borrowed $55,000 from Republic Savings Bank through a loan personally guaranteed by Barker. Nead and Barker personally paid the interest on this loan. Nead paid other UEDC expenses from his own pocket and did not keep records of the amounts disbursed on UEDC's behalf.
 
 
 18
 However, other factors weigh strongly against a finding of domination by Nead. Barker actively participated in UEDC's business and had at least as much involvement in, and control over, the company as did Nead. Barker co-founded the company, owned 50% of the stock, was President of UEDC during certain periods, and was instrumental in procuring a $55,000 bank loan for the company. Although Barker chose to resign as President prior to UEDC's suit and refrained from personally involving himself in the litigation, he did not exercise his rights as a 50% owner of the corporation to oppose it.
 
 
 19
 Moreover, there is no evidence that Nead used UEDC's funds for personal matters or intermingled corporate funds with his own. Although Nead and Barker personally paid UEDC's expenses and guaranteed UEDC's loans, neither shareholder withdrew UEDC's funds for his own use. The fact that Nead shifted personal funds to UEDC, but never UEDC funds to his personal account, further undercuts AFC's claim that Nead failed to treat UEDC as a separate corporate entity. Indeed, Nead and Barker's personal financing of UEDC's expenses shows no more than that UEDC was a start-up company, with so little ongoing business that there was no need for independent accounts in its name. Finally, there was no showing that any recovery in the Kentucky action would accrue only to Nead rather than to the jointly owned corporation. We therefore hold that the evidence of domination is inadequate as a matter of law.
 
 
 20
 With regard to the second prong, the district court found that the wrong inflicted on AFC consisted of Nead "interposing a sham corporation in an effort to force petitioners to resolve their disputes in a judicial forum rather than an arbitral one." 1996 WL 396131, at * 6. In that light, the district court described UEDC's Kentucky suit as a "fraud upon the law." Id. at * 5. We again disagree.
 
 
 21
 UEDC came into existence in 1993, well before the events in question. As noted above, the claim that UEDC is being compelled to arbitrate is not one for a breach of Nead's employment contract. In the Kentucky action, UEDC alleges that it was negotiating to purchase the Hiawatha property in its name but withdrew from the negotiations in order to enable AFC to purchase the property. The withdrawal was allegedly in exchange for AFC's promise to use UEDC's loading services and to allow UEDC to build certain load-out structures for the mines. It is this agreement, not Nead's employment contract, that is the subject of UEDC's breach of contract action in Kentucky.
 
 
 22
 We fail to see how instituting the Kentucky lawsuit constitutes the kind of fraudulent or wrongful conduct that calls for piercing the corporate veil. Cf. Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc., 758 F.Supp. 908, 917 (S.D.N.Y.1991) (stripping assets of subsidiary by parent to render subsidiary judgment-proof constitutes "fraud or wrong").
 
 
 23
 If the facts alleged by UEDC in the Kentucky complaint are true, that action cannot be deemed a sham to enable Nead to avoid arbitration because the arbitration clause is self-evidently inapplicable. Indeed, if the allegations are true, Nead himself cannot recover on the claim because it belongs to the corporation, not to a 50% or even 100% shareholder. See Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 849 (2d Cir.1986). If the facts are not proven, AFC will prevail and the fact that it did so in a judicial rather than arbitral proceeding will be irrelevant. We therefore hold that AFC failed as a matter of law to show the use of the corporate form for a wrongful or fraudulent purpose.
 
 
 24
 Given our disposition of this matter, we need not reach the question of whether UEDC was entitled to a jury trial. We therefore reverse and vacate the stay on the litigation in the Eastern District of Kentucky with respect to UEDC's claims.
 
 
 
 *
 The Honorable Robert J. Ward of the United States District Court for the Southern District of New York sitting by designation
 
 
 [1]
 Count V includes claims by the "plaintiffs" for recovery for AFC's failure to pay for certain expenses incurred by Nead and to repay UEDC's bank loan. However, nothing is alleged that would allow UEDC to recover for Nead's expenses
 
 
 [2]
 While the district court found AFC met both prongs of the test, it viewed the test as "disjunctive"--piercing the corporate veil either upon a showing of domination or upon a showing of a fraud or wrong, based on analysis in Thomson-CSF, 64 F.3d at 777. However, Thomson-CSF did not explicitly apply New York law, and that law is to the contrary. In Morris, 603 N.Y.S.2d 807, 623 N.E.2d at 1160-61, the New York Court of Appeals held that a conjunctive test was applicable and required a showing of both domination and fraud or wrong to justify the piercing of a corporate veil