In re RAYTECH CORPORATION,
Debtor.

Raytech Corporation, Raytech Composites, Inc., and Raytech Automotive Components Company f/k/a Advanced Friction Materials Company, Plaintiffs,

v.

Oscar E. Stefanutti, individually and as Trustee of the Oscar E. Stefanutti Family Trust I Dated May 27, 1988, Defendants.

Bankruptcy No. 89–00293.
Adversary No. 99–5058.

United States Bankruptcy Court,
D. Connecticut,
Bridgeport Division.

Sept. 9, 1999.

Brian M. Cogan, Stroock & Stroock & Lavan LLP, New York City, Elizabeth J. Austin, Pullman & Comley, LLC, Bridgeport, CT, for Plaintiffs.

Jeffrey Heuer, Jaffe, Raitt, Heuer & Weiss, P.C., Detroit, MI, Leslie Plaskon, Paul, Hastings, Janofsky & Walker, LLP, Stamford, CT, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR DISMISSAL, OR IN THE ALTERNATIVE, ABSTENTION

ALAN H. W. SHIFF, Chief Judge.

## BACKGROUND

The parties have submitted a joint stipulation which in relevant part provides the factual predicate for this order. The full text of the stipulation is attached as an Appendix.

A December 8, 1995 order of this court authorized Raytech Composites ("Composites"), a non-debtor Raytech subsidiary, to acquire Advanced Friction Materials Company ("AFM"). Pursuant to that order, on January 16, 1996, Composites agreed to purchase 47% of the outstanding shares of AFM from Oscar Stefanutti, its president and sole shareholder. The 1996 agreement provided that Stefanutti could exercise a subsequent put option to sell his remaining 53% of AFM stock to Composites for the greater of (a) $1.5 million, or (b) AFM's current annual after tax net income multiplied by a factor of 4.24. Stefanutti exercised the put option in January, 1998.

Under a 1998 agreement to which neither Raytech nor Composites are parties, AFM agreed to pay Stefanutti the put price, subject to the "final audited financials of AFM," payable 50% in cash and the remainder by a promissory note in three equal installments of principal and interest. *Stipulation* at ¶¶ 11, 14. In an April 30, 1998 letter, Stefanutti certified to the auditors that there had been no "[f]raud involving management or employees who have significant roles in [AFM's] internal control" and no "[f]raud involving others that could have a material effect on the financial statements." *Stipulation* at ¶ 13; Exh. E at ¶¶ 5(a), (b). The letter was also signed by AFM's Comptroller, Richard Hartwick. The final audit fixed the put price at $6,043,793.00, and AFM paid Stefanutti $3,021,896.50 on April 24, 1998. Stefanutti assigned his rights to the remaining 50% under the note to a family trust.

Sometime in 1998, AFM discovered that its comptroller had embezzled more than $2 million over an eight year period. In December of that year, AFM commenced an action against Hartwick and his wife in the United States District Court for the Eastern District of Michigan.

In March, 1999, Stefanutti informed Raytech that he intended to enforce AFM's obligations under the note should it fail to pay the first installment due April 24. AFM did not make that payment. Instead, on April 26, Raytech, Composites, and AFM (collectively, the "plaintiffs") commenced the instant adversary proceeding against Stefanutti and his family trust (collectively, the "defendants"), alleging that Hartwick's embezzlement concealed the true financial performance of AFM and that Stefanutti negligently misrepresented AFM's actual income in breach of his fiduciary duties, thereby inflating the purchase price of the stock by more than $3 million. The plaintiffs, *inter alia,* seek a declaratory judgment that they owe nothing under the note and that they are entitled to up to $1.5 million plus interest from the defendants. The plaintiffs further seek recision of the note.

On May 24, 1999, defendants, seeking to enforce their rights under the same note, commenced an action in Macomb County Circuit Court in Michigan, *Stefanutti v. Raytech Automotive Components Compa-*

ny f/k/a [AFM], case no. 99–2114–CK. On May 26, 1999, the defendants filed the instant motion to dismiss this adversary proceeding for lack of subject matter jurisdiction and failure to state a claim, or in the alternative, for abstention.

## DISCUSSION

### Jurisdiction

The defendants challenge this court's subject matter jurisdiction, which is a prerequisite for a determination of whether abstention under 28 U.S.C. § 1334(c) is necessary or appropriate. Title 28 U.S.C. § 1334(b) provides that "[n]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or court other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings ... related to a case under title 11." The bankruptcy court's authority to abstain under this section emanates from the district court's standing order of reference. *See* 28 U.S.C. §§ 157(a), (b)(1), and (c)(1). *See also Standing Order* (D.Conn. September 21, 1984); *Daly v. Biafore (In re Carrozzella & Richardson)*, 237 B.R. 536 (Bankr. D.Conn.1999); *Monaco v. United States Department of Education (In re County Schools, Inc.)*, 163 B.R. 424, 430 (Bankr. D.Conn.1994). Since, for the reasons that follow, this proceeding is at a minimum related to the underlying bankruptcy case, this court has jurisdiction to address the abstention issue.

■■■ The test for determining whether a civil proceeding is related to a bankruptcy case is whether the outcome of that proceeding "might have any conceivable effect" on the estate being administered in bankruptcy. *Publicker Industries, Inc. v. United States (In re Cuyahoga Equipment Corporation)*, 980 F.2d 110, 114 (2nd Cir. 1992); *In re Wood*, 825 F.2d 90, 93 (5th Cir.1987). "An action is related if the outcome could alter the debtor's rights, liabilities, options, or freedom of action either positively or negatively which in any way impacts upon the handling and administration of the debtor's estate." *In re Kolinsky*, 100 B.R. 695, 702 (Bankr. S.D.N.Y.1989); *In re Naugatuck Dairy Ice Cream, Co., Inc.*, 106 B.R. 24, 27 (Bankr. D.Conn.1989).

■■■ If this adversary proceeding is resolved in the plaintiffs' favor, the value of AFM will be increased by perhaps as much as $4.5 million. That increase will benefit the Raytech estate and its creditors. *See, e.g., Kolinsky, supra,* 100 B.R. at 703; *In re Mego Int'l, Inc.*, 28 B.R. 324, 326 (Bankr.S.D.N.Y.1983). That conceivable outcome is sufficient to establish this court's jurisdiction. *Kolinsky* at 704–05.

### Mandatory Abstention

Abstention is mandated when:

[u]pon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2) (1994).[1]

The plaintiffs argue that the instant proceeding arises in a case under title 11 because the acquisition of AFM by Composites, a non-debtor subsidiary, was specifically authorized by the December 8, 1995 order of this court, at the request of the debtor, following an objection raised by the Committee of Unsecured Creditors. *Plaintiff's Opposition to Defendant's Motion* at 5. The defendants respond that

---

1. For a discussion of the distinction between "arising under" and "arising in," *see Pinnacle Corp. v. Long Term Capital Management (In re Pinnacle)*, 237 B.R. 240, 242 (Bankr.D.Conn. 1999).

the matter could not have been brought here but for Raytech's bankruptcy, i.e., that action involves only state law issues and non-debtor parties. *Motion to Dismiss ... or, Alteratively ... to Abstain* at 6, 17. That controversy need not be resolved here, however, because for the reasons that follow, the court can and will abstain under § 1334(c)(1).

### Discretionary Abstention

 Section 1334(c)(1) provides

Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State Courts or respect for State law, from abstaining from hearing a particular proceeding ... related to cases under title 11.

The issue of whether a bankruptcy court should exercise its discretionary abstention turns on whether the administration of the bankruptcy case would be served best by that procedure. *In re Texaco,* 77 B.R. 433, 438 (Bankr.S.D.N.Y.1987) ("the primary concern should be whether the federal bankruptcy objectives are served [by conceding the bankruptcy court's jurisdiction] to a state court.") *Cf. In re Naugatuck Dairy Ice Cream, Co., Inc.,* 106 B.R. 24, 29 (Bankr.D.Conn.1989); *Marine Midland Bank v. Zurich Insurance Company, (In re Olympia & York Maiden Lane Finance Corporation, L.L.C.),* 1999 WL 58581, *8 (Bankr.S.D.N.Y.1999) (*citing Bevilacqua v. Bevilacqua,* 208 B.R. 11, 15 (E.D.N.Y.1997) and *In re Riverside Nursing Home,* 144 B.R. 951, 956 (S.D.N.Y.1992)). That conclusion is warranted here.

Parenthetically, it is observed that the state court action can be timely adjudicated. *See Stipulation* at ¶ 20 and Exh. K (according to an internet website, *http://www.libcoop.net/maccir/statisti.htm,* Macomb County Circuit Court statistically disposes of 87.4% of its civil cases within a two year period). Moreover, "[s]tate courts afford the best forum for deciding issues whose resolution turns on [the] interpretation of state law ...", *Naugatuck, supra,* and "[w]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *American Fuel Corp. v. Utah Energy Development Co., Inc.,* 122 F.3d 130, 133 (2nd Cir.1997). The stock purchase agreement provided that it "shall be governed by and constructed and enforced in accordance with the substantive laws of Michigan." *Stipulation, Exh. A* at § 7.8. Because this court would look to Michigan law in determining the enforcement of the note, the state court is the preferred forum. It is also observed that the resolution of the controversy is relatively insignificant. Unlike *In re Pinnacle, supra,* in which this court declined to exercise its discretion to abstain, this post petition controversy, which perhaps represents less than $5 million, is but one of the innumerable matters in the *Raytech* case, which include asbestos-related claims estimated in 1988 in excess of $33 billion. *See Schmoll v. ACandS,* 703 F.Supp. at 873, 874 n. 12 (D.Or.1988), *aff'd,* 977 F.2d 499 (9th Cir.1992). *See also, Raytech Corp. v. Official Committee of Unsecured Creditors of Raytech Corp. (In re Raytech),* 217 B.R. 679 (Bankr.D.Conn.1998).

More to the point, abstention would benefit the administration of the *Raytech* case because it would free the court to focus on issues which presently impede the process of plan confirmation, i.e., *Raytech et al. v. the Pension Benefit Guarantee Corp,* AP 99–5051; *Creditors Committee of Retirees v. Raytech et al.,* AP 99–5039; the ten adversary proceedings in which the Raymark trustee seeks to recover pre-petition retainers: AP 99–5032 through 5038 and AP 99–5044 through 5046; the four adversary proceedings in which Universal Friction Composites is a plaintiff: AP 99–5053 through 5056; Raytech's May 7, 1999 *Motion For An Order Authorizing Implementation Of A Severance Plan for Key Management Employees;* and a trial pursuant to *In re Raytech Corp.,* 206 B.R. 646 (Bankr.D.Conn.1997), *remanded,* Case. No. 3:97cv927 (D.Conn. August 13, 1999).

Further, whether this is a core or related proceeding, either side may demand a jury trial which would likely have to be tried in the district court. *See Ryan v. Smith (In re Raymark Industries, Inc.),* 228 B.R. 524, 526 (Bankr.D.Conn.1999) (noting that various defendants had joined in a motion to withdraw the reference on the basis of their jury demand and refusal to consent to a trial before the bankruptcy judge), pending in the District Court as *Ryan, et al. v. Smith, et al.,* Civ. No. 3:99CV284 (DJS) (D.Conn.). *See also In re Orion Pictures Corp.,* 4 F.3d 1095, 1101–02 (2nd Cir.1993) ("a district court might find that the inability of the bankruptcy court to hold a trial constitutes cause to withdraw the reference"). Indeed, the defendants expressly represented that they would exercise their right to a jury trial.[2]

For the foregoing reasons, the defendants' motion to abstain is GRANTED, and it is SO ORDERED.

## APPENDIX

Hearing Date:

August 25, 1999.

*STIPULATION OF FACTS REGARDING DEFENDANTS' MOTION TO DISMISS ADVERSARY PROCEEDING FOR LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED OR, ALTERNATIVELY, FOR BANKRUPTCY COURT TO ABSTAIN FROM HEARING THIS ADVERSARY PROCEEDING AND PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION*

The parties to this adversary proceeding, by their undersigned counsel, hereby stipulate and agree solely for purposes of the determination of Defendants' Motion to Dismiss dated May 26, 1999 and Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction dated June 14, 1999, that the following facts are uncontested:

## THE PARTIES

1. Plaintiff Raytech Corporation ("Raytech" or the "Debtor") filed a voluntary petition for relief under Chapter 11 on March 10, 1989. Raytech continues in the possession of its property as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. Plaintiff Raytech Composites, Inc. ("RCI") is a wholly-owned subsidiary of Raytech and a holding company for Raytech's operating subsidiaries.

3. Plaintiff Raytech Automotive Components Company f/k/a Advanced Friction Materials Company ("AFM") is a wholly-owned operating subsidiary of RCI and is a corporation organized and existing under the laws of the State of Michigan, having its principal place of business in Michigan.

4. Raytech is a holding company whose profits and losses are dependent upon the profitability of its operating subsidiaries, including RCI and AFM.

5. Defendant Oscar E. Stefanutti is a citizen of the State of Michigan and the Trustee of the Oscar E. Stefanutti Family Trust I Dated May 27, 1988 (the "Trust") which was created and exists pursuant to the laws of the State of Michigan (collectively, "Stefanutti").

## THE TRANSACTION

### 1996 Transaction

6. On or around January 16, 1996, RCI entered into a Stock Purchase Agreement with Stefanutti (the "1996 Agreement," a true and accurate copy of which is annexed as Exhibit A), by which RCI purchased 47% of the outstanding shares of AFM from Stefanutti. Neither Raytech nor AFM was a party to the 1996 Agreement.

---

**2.** In light of their jurisdictional challenge, the defendants did not, as the debtor contends, waive their Seventh Amendment right to a jury trial by failing to promptly demand one.

7. On October 3, 1995, the Official Committee of Unsecured Creditors of Raytech Corporation filed an adversary proceeding seeking to restrain the Debtor and RCI from entering into the 1996 Agreement. Prior to the Committee's objection, the Debtor had not sought Court approval for the acquisition but had advised the Committee of the proposed transaction pursuant to the existing stipulation between those parties governing notice of transactions involving the Debtor's subsidiaries. (A true and accurate copy of the stipulation is annexed as Exhibit B).

8. After notice and a hearing, the Bankruptcy Court (Shiff, C.B.J.), by Memorandum and Order dated December 8, 1995, held that RCI could proceed with the acquisition of AFM. (A true and accurate copy of the Memorandum and Order is annexed as Exhibit C).

**1998 Transaction**

9. Under the 1996 Agreement, Stefanutti received a "put" exercisable on the second anniversary of the closing (January 16, 1998) to sell the remaining 53% of his AFM stock to RCI at a price the greater of $1,500,000.00 or a formula equal to eight times AFM's current fiscal year net income after tax (as defined by generally accepted accounting principles) multiplied by 53 per cent.

10. In January 1998, Stefanutti exercised the put, and RCI assigned to AFM its obligation to purchase the remaining 53% of the AFM stock.

11. On April 24, 1998, AFM and Stefanutti entered into a Stock Purchase Agreement (the " 1998 Agreement," a true and accurate copy of which is annexed as Exhibit D), under which AFM agreed to pay the price set forth in the 1996 Agreement (the "Put Price") and further provided that the purchase price was "subject to final audited financials of AFM." Raytech and RCI are not parties to the 1998 Agreement.

12. The final audit of AFM's financial statements for the year ending December 31, 1997 was performed by Pricewaterhouse Coopers LLP f/k/a Coopers & Lybrand ("Coopers"), which issued its report certifying the financial statements of AFM on or around March 20, 1998. A Put Price of $6,043,793.00 was calculated based upon AFM's final audited financials as audited by Coopers for the fiscal year ended December 31, 1997.

13. On or about April 30, 1998, AFM issued a letter signed by Stefanutti, as President of AFM, and Richard Hartwick, Comptroller of AFM, to Coopers in connection with the audit of the financial statements of AFM as of December 31, 1997. (A true and accurate copy of this letter is annexed as Exhibit E).

14. Under the 1998 Agreement, the Put Price was payable 50% in cash and the remaining 50% by a promissory note calling for three equal, annual installments of principal and interest (the "Note"). On or about April 24, 1998, Stefanutti was paid $3,021,896.50, representing the first fifty per cent (50%) of the Put Price and, received the Note in an equal amount on that date. (A true and accurate copy of the Note is attached as Exhibit F). On April 27, 1998, Mr. Stefanutti assigned his rights under the Note to the Oscar E. Stefanutti Family Revocable Trust I dated May 27, 1988.

**THE LITIGATION**

15. In 1998, AFM discovered that Richard Hartwick, AFM's comptroller, had embezzled in excess of $2 million from AFM over a period of time going back as much as eight years. On December 16, 1998, RCI sued Richard Hartwick and his wife, Jan Hartwick, in the Eastern District of Michigan to, *inter alia*, recover the embezzled money. (A true and accurate copy of the First Amended Complaint dated January 11, 1999 is annexed as Exhibit G).

16. By Letter dated December 3, 1998, Coopers withdrew its report dated March

28, 1998 on the financial statement of AFM as of December 31, 1997 and for the year then ended, which Coopers stated "may affect the financial statements...." (A true and accurate copy of the Coopers' Letter dated December 3, 1998 is annexed as Exhibit H).

17. On March 5, 1999, Stefanutti wrote to Plaintiffs to inform them that he would seek to enforce the Note if AFM failed to make the first installment due on April 24, 1999. (A true and accurate copy of this letter is annexed as Exhibit I).

18. AFM failed to make its first installment on the Note due April 24, 1999. On April 26, 1999, Plaintiffs filed this adversary proceeding against Stefanutti for, *inter alia*, declaratory relief and money damages in an amount yet to be determined.

19. On May 24, 1999, Stefanutti filed a complaint against AFM in Macomb County Circuit Court in Michigan to enforce the Note. (A true and accurate copy of this pleading is annexed as Exhibit J).

20. According to publicly available Macomb County Circuit Court statistics for 1998 (as reported on that court's website at www.libcoop.net/maccir/staisti.htm), 87.4 percent of the civil cases in that circuit were disposed of within 24 months. (A true and accurate printout of this web page is annexed as Exhibit K).

## STATUS OF REORGANIZATION

21. Raytech, together with the Official Equity Committee, the Official Creditors' Committee, the Guardian Ad Litem for the Future Claimants, the State of Connecticut, Department of Environmental Protection and the United States Department of Justice, Environmental and Natural Resources Division, entered into a Memorandum of Understanding on July 23, 1998, with respect to a consensual plan of reorganization, which provides, *inter alia*, that general unsecured creditors will receive 90% of the equity in the reorganized Raytech and the existing Raytech equity will receive the remaining 10%. To date no plan of reorganization consistent with the Memorandum of Understanding has been filed. (A true and accurate copy of the Memorandum of Understanding is annexed as Exhibit L).

Dated: August 17, 1999.