GOYA FOODS, INC., Plaintiff,

v.

Ulpiano UNANUE–CASAL, a/k/a Charles Unanue; Liliane Unanue, and Kalif Trading, Inc., Defendants.

No. CIV. 95–2411 (JAF).

United States District Court, D. Puerto Rico.

Oct. 31, 1997.

Arturo J. Garcia–Sola, McConnell Valdes, San Juan, PR, for Goya Foods, Inc.; Ira Brad Matetsky, Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY, of counsel, for Plaintiff.

Charles Unanue, New York, NY, pro se.

Jane Becker Whitaker, Troncoso & Becker, San Juan, PR, for Liliane Unanue, Kalif Trading, Inc.

### MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

FUSTE, District Judge.

This case was tried before the court from July 2 to July 16, 1997. The court enters its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I.

This case is another chapter in a long-standing dispute among members of the Unanue–Casal family, stockholders of the Goya Foods enterprises. The case has been litigated with tenacity by all parties in Puerto Rico and other jurisdictions on the mainland for more than two decades. *See generally, In re Unanue–Casal,* 164 B.R. 216 (D.P.R. 1993), *aff'd,* 32 F.3d 561 (1st Cir.1994), *cert. denied,* 513 U.S. 1149, 115 S.Ct. 1098, 130 L.Ed.2d 1066 (1995). In order to provide the reader immediate background, we briefly recount the events surrounding the Unanue–Casal family controversy.

In 1969, prior to the death of the family progenitor, Prudencio Unanue, a dispute arose between Ulpiano (Charles) Unanue and his brothers backed up by their father, Prudencio Unanue. As a result of the conflict, Charles Unanue was removed from his position as an officer and director of Goya Foods and its various affiliated companies. This event set the stage for a series of lawsuits amongst the siblings.

In 1972, the parties tried to settle their differences by reaching an agreement (1972 Agreement) under which Charles Unanue was to receive certain payments in return for selling his shares in the Goya companies. A year later, Charles Unanue claimed that the other parties to the agreement had breached it. In 1974, the parties amended the agreement (1974 Amendment): In addition to selling his ownership interest in all of the Goya companies, Charles Unanue agreed never to bring any claim or suit contesting or objecting to his father's will or trust, and not to interfere with the disposition of assets of stock by his father, his estate, the beneficiaries or his brothers. The 1974 Amendment also specified that any signatory to the amended stipulation who lost a suit concerning Prudencio Unanue's will or trust with another signatory had to pay the winner liquidated damages of double costs and attorney's fees. By 1976, Goya had paid Charles Unanue more than $4.4 Million for his share

of the Goya corporations pursuant to the 1972 Agreement and the 1974 Amendment.

In 1987, eleven years after Prudencio Unanue's death, Charles Unanue demanded from his brothers his share of his parents' estate. Joseph and Frank Unanue, as trustees of their father's trust, sued Charles Unanue in the Superior Court of New Jersey, Probate Part. They sought a declaratory judgment barring Charles Unanue from maintaining any claims against their father's estate and trust as agreed upon in the 1974 Amendment. In 1995, a New Jersey trial court entered judgment against Charles Unanue and ordered him to pay liquidated damages pursuant to the 1974 Amendment, totalling $6.9 Million. Charles Unanue appealed the judgment, but did not post a supersedeas bond or move for a stay of its enforcement. The New Jersey Supreme Court has the appeal under submission.

In the present case, Goya seeks to collect this judgment against Charles Unanue. Goya alleges that Charles Unanue is the beneficial owner of all the property that ostensibly belongs to his wife, Liliane Unanue, and to Kalif Trading, Inc.,[1] a Panamanian company that allegedly serves as defendant's *alter ego.* Among the assets are cash, securities, and several apartments. Because Charles Unanue, claiming to be insolvent, has no property in his name, Goya has been prevented from satisfying the $6.9–Million judgment.

The facts in this case span across two continents and more than two decades, and involve a myriad of transactions. Therefore, we have organized our findings along spacial lines for a better, comprehension of the conclusions of law that follow our findings of fact.

### A. *Puerto Rico Transactions*

In 1968, Charles and Liliane Unanue acquired Apartment 5A at the San Gerónimo Condominium, 860 Ashford Avenue, San Juan, Puerto Rico. Three years later, in 1971, they transferred the property to Emperor

---

1. This court entered the default of Liliane Unanue and Kalif Trading for failure to comply with court orders. See *Docket Document Nos. 20 & 104.* Notwithstanding that fact, the record confirms that the court liberally allowed Liliane Unanue to present evidence at trial. *See* Fed. R.Civ.P. 1.

Equities, Inc. The corporation was solely owned by Liliane Unanue, with Charles Unanue serving as an officer of the corporation until 1988. Defendants admitted at trial that they decided to transfer the property to this corporation on counsel's advice to avoid any claim that Charles Unanue had a proprietary interest in the apartment. Back then, Charles Unanue was in contested litigation with Goya, and some of the claims sought money judgments against him.

By November 1972, Emperor Equities had purchased two more apartments at the San Gerónimo Condominium: Apartment 5D and Penthouse 11B. At that time, Charles Unanue had already received substantial payments from Goya. Although the apartments belonged to the corporation, defendants moved their residence to the penthouse in 1973.

Emperor Equities eventually sold or transferred Apartment 5D and Penthouse 11B. In August 1983, Emperor Equities transferred Penthouse 11B to Kalif Trading, the Panamanian company. In 1991, it sold Apartment 5D to a third party; after the sale, most of the sale proceeds were transferred to a Swiss bank account to ensure that Goya would be unable to attach the funds.

### B. *New York Transactions*

After Charles Unanue had received all his settlement payments from Goya, both Charles and his wife Liliane participated in a series of real estate and securities transactions in New York.

In March 1976, Liliane Unanue bought shares in a cooperative apartment at 625 Park Avenue in New York. Despite a very low purchase price of $28,000, Liliane Unanue still had to borrow money from Citibank for this transaction because she had no liquid assets. There is no documentary evidence as to who eventually paid off the loan. Although the purchase price was only $28,000, maintenance payments were $3,000 a month. Charles Unanue, and not Liliane, guaranteed to the coop board the maintenance payments. Moreover, the apartment required extensive renovations and Charles Unanue procured insurance and became the insured party in connection with these renovations.

Several years later, in 1981, Liliane Unanue purchased an apartment at the Sutton House, on East 52nd Street. Charles Unanue had leased this apartment since 1969. The person or entity who paid for the Sutton House apartment did so with a bank check drawn on Credit, Suisse in New York. At the time, only Kalif Trading had an account at that bank. Eventually, this property was sold to a third party.

Charles Unanue also invested in securities. In January 1977, Charles Unanue provided a certified financial statement to First National City Bank (Citibank). He listed as his largest asset a Merrill Lynch securities account, denominated "Mr. Charles Unanue A/C No. 2" with a net value of $1,449,000. He listed another account as "Citibank Custody Account," which had a cost value of $158,640, and a market value of $242,390. Later that same year, in November, Charles Unanue provided Merrill Lynch with personal financial information. He declared that he had at least $2,000,000 in securities. Six months later, in May 1978, Charles Unanue individually submitted a financial statement to Citibank. Charles Unanue listed the "Mr. Charles Unanue A/C No. 2," with a value of $1,977,783 net of margin debt. Finally, in September 1978, an internal memorandum from Citibank stated that Charles Unanue's equity in his Merrill Lynch accounts was approximately $2.5 Million.

In spite of this $2.5 Million equity, Charles Unanue alleges that he had no personal funds left by 1980. He claims that taxes, attorney's fees, litigation, and living expenses consumed all his wealth, but he has no documentation to support his claim. On the other hand, Goya argues that Charles Unanue maintained substantial assets in the name of Kalif Trading. In November 1980, all the securities in the "Mr. Charles Unanue A/C No. 2" account deposited first at Merrill Lynch and later at E.F. Hutton, were transferred to a new E.F. Hutton account in the name of Kalif Trading, Inc. The securities transfer from the Mr. Charles Unanue No. 2 account to the Kalif Trading account was effected in a letter signed by Liliane Unanue on behalf of Kalif Trading.

During the eighties, over $1 Million in checks were drawn from Kalif Trading's bank accounts at the Dresdner Bank and Credit Suisse payable to or for the benefit of Charles and Liliane Unanue. The Unanues deposited more than $700,000 in their personal checking accounts. In addition, checks representing thousands of dollars were drawn payable to the San Gerónimo Condominium Association, to the management of the Park Avenue and Sutton House apartments, to Emperor Equities, casinos, and credit card companies. Charles Unanue signed virtually all the checks.

### C. Spain Transactions

In May 1972, Liliane Unanue acquired a real estate villa in Fuengirola, Province of Málaga, Spain. She paid for the property in installments over a period of four years, ending in 1976. Defendants testified that Liliane Unanue paid for the property with her own funds. There is no documentation confirming the source of the money.

### D. France Transactions

In 1985, the Société Hermitage Global, a Panamanian corporation owned solely by Liliane Unanue, bought an apartment in Paris, France. The apartment was subsequently transferred to Liliane Unanue.

## II.

### A. Kalif Trading as Charles Unanue's alter ego

Goya seeks to impose liability on Kalif Trading for the judgment it obtained against Charles Unanue in the New Jersey Superior Court, contending that the corporation is an *alter ego* of Charles Unanue. It requests that we pierce the corporate veil and impose Charles Unanue's obligation on Kalif Trading.

#### 1. Governing Law

■ Because Kalif Trading was involved in transactions in New York and Puerto Rico, we are faced with the threshold issue of which state law applies to this issue. Where the court's jurisdiction over the asserted claim arises from the diversity of the parties,

as in this case, the court applies the rules regarding choice of law of the forum state. *In re Dupont–Benlate Litigation,* 877 F.Supp. 779, 783 (D.P.R.1995). In Puerto Rico, courts have applied the "most significant contacts" test in cases involving tortious damages, contractual breaches, and the judicial process of piercing the corporate veil. *A.M. Capen's Co. v. American Trad. & Prod. Corp.,* 74 F.3d 317, 321 (1st Cir.1996); *Wadsworth. Inc. v. Schwarz–Nin,* 951 F.Supp. 314, 320–21 (D.P.R.1996); *De Fornaris v. American Surety Co.,* 93 D.P.R. 29 (1966). Among the contacts to consider are the parties' place of incorporation and of business, the place where the injurious conduct occurred, the place where the injury materialized, and the place where the relationship between the parties is centered. *Wadsworth,* 951 F.Supp. at 321–22.

■ In this case, Goya alleges that Charles Unanue has used Kalif Trading to launder his personal funds and conduct his personal business. Goya has presented documentary evidence that in November 1980, Charles Unanue transferred all the securities in his E.F. Hutton account in New York to a newly-opened E.F. Hutton account also in New York and registered in the name of Kalif Trading. In addition, New York was the center of Kalif Trading's banking transactions, from where Charles Unanue issued checks in the corporation's name and where the corporation's funds were located. It also appears that Charles Unanue paid for the Sutton House apartment and for maintenance payments of the Park Avenue apartment with Kalif Trading's funds located in New York. From these facts, we find that New York has more significant contacts with the matter at hand than any other possible jurisdiction. Therefore, New York law will govern our determination of whether to pierce the corporate veil in this case.

#### 2. Piercing the Corporate Veil

■ It is a well-established principle of corporate law that "a corporation exists independently of its owners, as a separate legal entity, ... and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners."

*Morris v. Department of Taxation,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 810, 623 N.E.2d 1157, 1160 (1993). Courts have found, however, circumstances that require the piercing of the corporate veil in order to prevent fraud or achieve equity. *State of New York v. Easton,* 169 Misc.2d 282, 647 N.Y.S.2d 904, 908 (N.Y.Sup.Ct.1995). There exist two modalities for piercing the corporate veil. One is the classic piercing of a corporation's charter to impress the debts of a corporation upon its owners. The other, which is the one sought by Goya, is available when the court disregards the corporate form to reach the assets of a corporation for the debts of its owners. This modality is known as reverse piercing. *Id.* at 908–09. *See generally,* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* §§ 41–41.10, 41.70 (rev.perm. ed.1990).

■ Regardless of the modality used, courts will, evaluate the attendant facts and equities of each case in deciding whether to disregard the corporation's separate identity, since piercing the corporate veil has been characterized as an equitable remedy. *David v. Glemby Co., Inc.,* 717 F.Supp. 162, 166 (S.D.N.Y.1989); *Easton,* 647 N.Y.S.2d at 908. And because of the equitable nature of the remedy, the court will intervene even if the alleged wrongdoer is not a legal owner of the corporation but an equitable one, as alleged in this case. *Id.* at 909. Although no bright-line rules govern the different circumstances when courts will deny corporate independence, courts have generally required a showing that: "(1) [T]he owners exercised complete domination of the corporation in respect to the transaction attacked; and, (2) that such domination was used to commit fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Easton,* 647 N.Y.S.2d at 908, *citing Morris,* 623 N.E.2d at 1161.

■ Here, we must start by expressing that the story of Kalif Trading and the accounts surrounding what appears to be its fictional owner, Mr. Mohammed Kalif, are incredible. Charles and Liliane Unanue testified that Mr. Kalif is an old friend of Mrs. Unanue's family. He supposedly is a wealthy octogenarian Arab with unknown address somewhere in the Middle East. The Unanues allegedly have met up with him in such far away locations as Istanbul, and Beirut. In spite of the bulky binders of exhibits that the defendants have submitted and the many discovery requests made by Goya, the defendants have not provided a scintilla of evidence as to Mr. Kalif's existence or whereabouts. Goya tried to contact Mr. Kalif through an attorney in Istanbul, with no results. The voluminous trial record before us contains only one document, a 1979 bank account signature card from the Dresdner Bank, bearing a purported signature of Mr. Kalif. At trial, Charles Unanue admitted, however, that he may have signed the name himself.

During the 1970's, Mr. Kalif allegedly transferred approximately two million dollars to Charles Unanue and instructed him to invest the money in Charles Unanue's name. At the time, Mr. Kalif desired to invest in the United States, but did not want the funds and investments that Charles Unanue was handling to be traced to him. Although Mr. Kalif wanted to remain anonymous, in June 1979, Charles Unanue traveled to Panama for the purpose of incorporating Kalif Trading, a company whose namesake was precisely Mr. Kalif. Days after its incorporation, the company issued general and unrestricted powers of attorney to Charles and Liliane Unanue, and to Mr. Kalif. Charles Unanue has been the only one who has used his power of attorney extensively to manage all the company's accounts.

The largest of these accounts was the investment account maintained at E.F. Hutton. The trading records for this account demonstrate that Charles Unanue must have spent a considerable amount of time making investment decisions and dealing with brokers, and yet Charles Unanue did not receive any compensation for his efforts. To the contrary, the Unanues testified that when Charles Unanue allegedly became insolvent, they were forced to borrow money from Mr. Kalif. However, there is no documentation to sustain that any bona fide lending ever occurred.

On the other hand, there is documentary and circumstantial testimonial evidence that Mr. Kalif is a fictional character and that

Kalif Trading is the mere *alter ego* of Charles and Liliane Unanue. There appears to be no geographical limitation on Charles Unanue's empowerment to act on behalf of the company. He has managed the company's accounts in America, as well as in Europe. Charles Unanue used his address in Fuengirola, Spain, as the company's address on all bank and securities accounts. Charles and Liliane Unanue are named on the various opening and signature documents for Kalif Trading's accounts.

The evidence further shows that Charles Unanue managed the company without ever keeping a proper set of financial books and records. There is only one corporate meeting reflected in the company books. This meeting took place in 1983 in Panama. Charles Unanue served as president and Liliane Unanue as secretary of the corporation. At this single meeting, Liliane Unanue was named secretary of Kalif Trading and Mr. Kalif was named president and director. Two other directors, Mr. Said Nazif Ibrahim and Mr. Mehdat Nabih Fakim, were appointed. The existence and whereabouts of these two gentlemen remain as unknown as that of Mr. Kalif. When Charles Unanue was confronted with the prospect of providing evidence about Mr. Kalif in this litigation, Mr. Kalif supposedly removed himself from the directorship of Kalif Trading and turned over the company to Liliane Unanue in 1996. Mrs. Unanue then named herself president and treasurer of the corporation.

In conclusion, we find that Charles Unanue is the equitable owner of every asset nominally held in the name of Kalif Trading, to wit, the bank and securities accounts and Penthouse 11B at San Gerónimo Condominium. Since the corporation's creation in 1979, Mr. Unanue has exercised complete dominion and control over the corporation's assets and has intermingled his financial affairs with those of the Panamanian corporation.

**B.  *Assets in Liliane Unanue's Name***

Goya also contends that Charles Unanue is the beneficial owner of substantially all the assets held in his wife's name. Charles and Liliane Unanue claim that she is the sole proprietor of all the residences that Goya claims belong to him. Liliane Unanue claims to be independently wealthy and tried to prove that she alone purchased the residential properties in Puerto Rico, New York, Spain, and France.

After careful consideration of the trial record, we find that Liliane Unanue, like Mr. Kalif, is an *alter ego* of Charles Unanue. In considering whether Liliane Unanue is Charles Unanue's second self, we found no applicable New York or Puerto Rico case law. These two jurisdictions have the most significant contacts with the issue at hand, and New York and Puerto Rico law can best assist in our analysis. *A.M. Capen's Co.*, 74 F.3d at 321. We consequently borrow with modifications the analysis applied in the New York corporate *alter ego* cases discussed previously, as well as bankruptcy precedent where the debtor has transferred assets with the intent of defrauding creditors, 11 U.S.C. § 727(a)(2) (1988). This court has considered such factors as the control that Charles Unanue has exercised over Liliane Unanue's properties, the benefit and use of Liliane Unanue's properties by him, the manner in which he treated the properties, and the consideration that Liliane Unanue provided for the properties. *See Salomon v. Kaiser*, 722 F.2d 1574, 1582 (2d Cir.1983) (insolvent debtor purchased two homes with his own money, but had title to both placed in the name of his wife, who provided no consideration for the transfer, and debtor continued to retain possession, benefit, and use of the properties and treated them as his own, thus establishing a scheme to defraud creditors); *EFA Acceptance Corporation v. Cadarette*, 601 F.2d 648, 651–52 (2d Cir.1979) (bankrupt transferred car, boat, and trailer to his fiancee without consideration some three weeks prior to filing for bankruptcy and continued to use the property, demonstrating intent to shield assets from creditors); *In re Bottone*, 209 B.R. 257 (Bankr.D.Mass.1997) (material question of fact existed as to whether debtor, by continuing to reside rent-free in home which he had conveyed to his wife, was effecting a continuing concealment of his interest in home, precluding summary judgment

in proceeding brought to deny debtor's discharge).

As much as we liberalized the constraints imposed upon Liliane Unanue in the context of her default, the origins of Mrs. Unanue's wealth are totally unverifiable. Neither Charles nor Liliane Unanue have any documentation to prove that her wealth ever existed.

Liliane Unanue's family was allegedly an affluent Bulgarian family (the Dalkalovs) who suffered the hardships of World War II, but who managed nevertheless to remove part of their wealth and properties from their war-torn country before the Communists took over. However, the only documentary evidence of the existence of this wealth was provided by Mrs. Vivian Schultz, Liliane's sister, who located and produced at trial certain bank books relating to savings accounts held in a bank in Sophia, Bulgaria, before World War II. The accounts were in the names of Liliane's father, mother, and Mrs. Schultz. The amounts that appear deposited are modest in comparison to the alleged family fortune and there is no explanation as to how these funds were ever transferred outside of Bulgaria.

At trial, Liliane Unanue testified that during the 1950's and 1960's, her mother gave her substantial family assets which included cash, jewelry, gold bullion, artwork, furniture, and antiques. Owing to the fact that such bestowal occurred decades ago, she was allegedly unable to provide even an estimate of her wealth at any time, either in the United States or Europe. However, her sister Vivian, older than Liliane and who allegedly received cash from her mother on or about the time that Liliane Unanue did, was able to recollect, out of memory, that between 1956 and 1978, she brought into the United States approximately $200,000. There is no documentation of any of the assets transferred or imported into the United States, although Liliane Unanue and her former husband, Mr. William Bates, testified that she did bring some furniture, artwork, and antiques into this country. The total absence of documentation or verifiable information as to the sources of Liliane Unanue's alleged wealth stands in stark contrast to the bulk of photocopies of hotel bills and airplane ticket receipts that the Unanues have furnished to prove that their lifestyle drained them of all their liquid assets.

An attempt to account for Mrs. Unanue's wealth is contained in two documents submitted by Goya. The first is a form providing financial information to Merrill Lynch in November 1977. The form indicates that Liliane Unanue's net worth at the time included just $128,000 in securities. She made no mention of any of the property that her mother allegedly gave her. The second document, prepared only a year later and signed by Charles Unanue on Liliane Unanue's behalf, is a certified financial statement that Mrs. Unanue submitted to Citibank. Mrs. Unanue represented that she had cash in the amount of $37,000, securities totaling over $500,000, jewelry with an estimated value of $72,300, artwork of $133,400, and her furniture and antiques of $117,000. No mention of the gold bullion was made. These documents do not aid us in determining the sources of Liliane Unanue's independent wealth. By 1977, Charles Unanue had already received all the settlement payments from Goya. Therefore, Liliane Unanue's assets could have very well been provided to her by Charles Unanue and not by her parents as alleged.

In spite of her purported wealth, Mrs. Unanue never invested in real estate prior to marrying Charles Unanue in 1967. Although she had lived in the United States since the late 1950's, she never owned any real property in this country. Yet, suddenly, one year after her marriage to Charles, Mrs. Unanue began her acquisition of several residences here and abroad. As with the story of Mr. Kalif, we are again confronted with defendants' bare allegations, a dearth of documentation, and the incorporation of entities for the only apparent corporate purpose of concealing assets, making it very difficult to give credibility to defendants' version of facts.

As to the three apartments located in Puerto Rico, it appears that Liliane Unanue incorporated Emperor Equities for the only purpose of transferring title to the Puerto Rico apartments. The first of these apartments was Apartment 5A, San Gerónimo

Condominium, which the Unanues bought in 1968. During trial, the Unanues admitted that they transferred Apartment 5A to Emperor Equities in 1971 to avoid any claim that Charles Unanue had an interest in the San Gerónimo apartment. That being the case, such sale never came into existence under Puerto Rico contract law. Article 1213 of the Puerto Rico Civil Code bases a valid contract on "(1) [t]he consent of the contracting parties; (2)[a] definite object which may be the subject of the contract; (3)[t]he cause for the obligation which may be established." 31 L.P.R.A. § 3391 (1990). The Civil Code states further that "[c]ontracts shall be binding ... provided the essential conditions required for their validity exist." 31 L.P.R.A. § 3451 (1990). A contract that lacks any of these necessary elements is null from its inception and, therefore, the statute of limitations does not affect it. *Rodriguez v. Sucesion Pirazzi*, 89 D.P.R. 506, 547 (1963). "Contracts without consideration or with an illicit one have no effect whatsoever. A consideration is illicit when it is contrary to law and good morals." 31 L.P.R.A. § 3432 (1990). The sale contract of Apartment 5A lacked consideration. Charles Unanue never received any type of consideration for the sale of the property. The sale of the property was plainly a scheme to prevent anyone from discovering or attaching Charles Unanue's interest in the property.

By November 1972, when Charles Unanue had already received more than $500,000 in cash payments from Goya, Emperor Equities had purchased two more apartments at San Gerónimo for a total of $220,000. Although there is no evidence as to who exactly provided the funds for the purchase of these apartments, it can be inferred that Charles Unanue did with the proceeds received from Goya, specially since Liliane Unanue has been unable to provide any evidence as to her financial means for such investment. Our inference is supported by the 1978 financial statement that Charles Unanue submitted to Citibank. In that statement, Mr. Unanue listed a $223,000 loan receivable from Emperor Equities.

Four years after the purchase of the San Gerónimo apartments, Liliane Unanue bought the Park Avenue apartment for the nominal amount of $28,000. Despite all her professed wealth, she was forced to borrow money from Citibank to pay for the apartment, allegedly because she had no liquid assets. Again, it remains a mystery who ultimately paid for it, if not Charles Unanue, who by that time had received the millionary payments from Goya.

Charles Unanue, and not Liliane, also appears to be the *de facto* owner of the house in Fuengirola, Málaga, Spain, and the Paris apartment. Liliane Unanue contracted to acquire the Spanish property when Charles Unanue had already received over $100,000 from plaintiff. As to the Parisian apartment, once more we find a Panamanian corporation as purchaser of the real property, which was eventually transferred to Liliane Unanue's name. There is no documentary evidence that Mrs. Unanue paid for these residences out of her own funds, as defendant adamantly claims. Defendant points to the monies derived from the selling of Liliane Unanue's furniture, jewelry or art as the source of funding for these purchases, but loses sight of the fact that these sales took place in the 1990's, two decades after the Spanish house was bought and one decade after the Paris apartment was purchased.

In sum, the credible evidence in this case points to the fact that Charles Unanue paid for the properties held in Liliane Unanue's name with the payments he received under the 1972 Agreement and 1974 Amendment. Charles Unanue's defense that the purchase funds derived from gifts Liliane Unanue received from her well-to-do Bulgarian family is uncorroborated by evidence other than Charles and Liliane Unanue's testimony. While the testimony of a credible witness may be sufficient to prove a point, here the lack of documentation, coupled with the incredible account surrounding Mr. Kalif and his unusual relationship with the Unanues, does not allow us to give credibility to the claimed Daskalov fortune. Given the testimonies of Mrs. Schultz and Mr. Bates, it is not difficult to accept that the Daskalovs were an upper middle-class family that managed to remove from their country sufficient funds to relocate elsewhere. But it is too

much to ask that we give credibility to the account of the magnitude of the Daskalov wealth without any evidence as to how much it was and how it was invested, managed, and kept.

In addition, Charles Unanue has benefitted from the use and enjoyment of all these residences, and in many occasions referred to them as his own in letters to third parties. He also contributed to the maintenance of these properties throughout the years. We cannot countenance Charles Unanue's device of hiding his assets in the name of his wife for the purpose of impairing his creditors.

### III.

In light of the foregoing, judgment shall be entered in favor of Goya Foods, Inc., and against Charles Unanue and his *alter egos,* Kalif Trading, Inc., and Liliane Unanue, allowing plaintiff to execute the New Jersey $6.9–Million judgment against the defendants' properties described here.

Because Kalif Trading is Charles Unanue's *alter ego,* a money judgment shall be entered by this court against Kalif Trading in the full amount for which Charles Unanue is indebted to Goya as ordered by the New Jersey courts, including Goya's right to execute judgment over Penthouse 11B, San Gerónimo Condominium, 860 Ashford Avenue, San Juan, Puerto Rico.

Regarding Liliane Unanue, the court recognizes plaintiff's right to execute judgment over the properties known as the Sutton House apartment in New York City and any residence registered to her name, including the Fuengirola, Málaga, Spain, villa and the Paris apartment.

The court also concludes that Charles and Liliane Unanue acted with intent to defraud creditors by transferring, removing, and concealing property, records, information, and other financial information.

Attorney's fees and costs are imposed upon the defendants. Final execution of judgment will not be authorized until this case is reviewed by the U.S. Court of Appeals, First Circuit, and the New Jersey Supreme Court addresses the merits of the pending appeal, and only if the result is favorable to Goya, unless good and sufficient surety is posted.

**IT IS SO ORDERED.**