# United States Court of Appeals
## For the First Circuit

---

No. 98-1553
No. 99-1307
No. 99-2056
No. 99-2211

GOYA FOODS, INC.,

Plaintiff, Appellee,

v.

LILIANE UNANUE and KALIF TRADING, INC.,

Defendants, Appellants.
_____

ULPIANO UNANUE-CASAL,
a/k/a CHARLES UNANUE

Defendant.

---

No. 98-1554
No. 99-1308
No. 99-2057
No. 99-2212

GOYA FOODS, INC.,

Plaintiff, Appellee,

v.

ULPIANO UNANUE-CASAL,
a/k/a CHARLES UNANUE,

Defendant, Appellant.
_____

LILIANE UNANUE and KALIF TRADING, INC.,

Defendants.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jose Antonio Fuste, U.S. District Judge]

_____

Before

Selya, Circuit Judge,

Wallace,[*] Senior Circuit Judge,

and Boudin, Circuit Judge.

_____

Jan Alan Brody with whom Roger Juan Maldonado, Jared Forminard and Balber Pickard Battistoni Maldonado & Van Der Tuin, PC were on consolidated brief for defendants Liliane Unanue and Kalif Trading, Inc.
Ulpiano Unanue-Casal, a/k/a Charles Unanue, pro se.
David J. Eiseman, Jose-Manuel A. de Castro and Golenbock, Eiseman, Assor & Bell on consolidated brief for defendant Ulpiano Unanue-Casal, a/k/a Charles Unanue.
Ira Brad Matetsky, Legal Department, Goya Foods, Inc., with whom Arturo J. Garcia Sola and McConnell Valdes were on consolidated brief for plaintiff.

_____

November 28, 2000

_____

_____

[*]Of the Ninth Circuit, sitting by designation.

BOUDIN, Circuit Judge. This case involves an effort by a judgment creditor to reach both certain assets of the debtor nominally owned by the debtor's wife, and all assets owned by the debtor's alleged corporate "alter ego," Kalif Trading, Inc. The judgment creditor is Goya Foods, Inc., a major business founded in the 1930s which is now a Delaware corporation with its principal place of business in New Jersey. The debtor is Ulpiano Unanue-Casal, known as Charles, and his bankruptcy estate. The factual background and prior proceedings are as follows.

From the late 1940s until 1969, Charles served as one of the chief officers of Goya, a company founded by his father. In June 1969, in a quarrel among family members, Charles was dismissed and litigation ensued. As a result of settlements in 1972 and 1974, Charles received more than $4 million from Goya and, in exchange, gave up his interest in Goya. Charles also agreed not to bring any further claim or suit regarding his father's will or estate. The agreement provided for liquidated damages of twice the winning side's litigation expenses, including attorney's fees, if any signatory wrongfully initiated new litigation against another signatory.

In 1987, Charles made a claim for a share of the inheritance from his parents, and litigation in New Jersey state

-3-

court followed, with his brothers seeking a declaration that Charles had no interest in either his father's estate or his inter vivos trust. In 1990, while the New Jersey litigation proceeded, Charles filed for bankruptcy in Puerto Rico, and his bankruptcy estate thereafter became a party to the New Jersey litigation. In February 1995, the New Jersey court entered a judgment against both Charles and his estate for about $6.9 million, representing liquidated damages for Goya, a signatory of the 1974 settlement that Charles had violated by making his inheritance claims.[1]

Meanwhile, prior to this New Jersey judgment, Goya had begun adversary proceedings in Charles' bankruptcy case in Puerto Rico, asserting that Charles was concealing his own assets under the names of his wife, Liliane, and two other companies, Emperor Equities, Inc., a Delaware corporation wholly owned by Liliane, and Kalif Trading, a Panamanian corporation which was organized by Charles.[2] On September 12, 1995, the

---

[1]The New Jersey judgment was entered, In re Unanue, No. M-128817, slip op. (N.J. Super. Ct. Ch. Div. Feb. 23, 1995), and has since been affirmed, 710 A.2d 1036, 1041 (N.J. Super. Ct. App. Div.), cert. denied, 724 A.2d 801 (N.J. 1998).

[2]In 1991, after Emperor sold a piece of real property and proceeds were transferred to a Swiss bank account in Liliane's name, the bankruptcy court restrained remaining sales of real property pendente lite. See Quiros-Lopez v. Unanue-Casal (In re Unanue-Casal), 144 B.R. 604, 606-07 (D.P.R. 1992).

-4-

bankruptcy court dismissed Charles' bankruptcy case without granting him a discharge. In re Unanue-Casal, No. 90-04490, slip op. at 5 (Bankr. D.P.R. Sept. 12, 1995).

In November 1995, nine months after obtaining the New Jersey judgment for $6.9 million, Goya brought the present action in federal district court in Puerto Rico against Charles, Liliane, and Kalif Trading, seeking to enforce the New Jersey judgment against Charles and against properties that Goya claimed belonged to Charles but were held in the name of Liliane or Kalif Trading. A ten-day bench trial ensued in the district court in July 1997, and both Charles and Liliane testified. On October 31, 1997, the court filed a lengthy decision in Goya's favor, Goya Foods, Inc. v. Unanue-Casal, 982 F. Supp. 103 (D.P.R. 1997). Clarifying amendments to the judgment followed on March 10 and December 14, 1998.

The district court concluded that Charles was the true owner of specified cash, securities and various real properties held in the names of Liliane, Emperor Equities, and Kalif Trading. The court rejected as false assertions by Charles and Liliane that Kalif Trading was owned by a wealthy Arab (who did not appear at trial), and that a supposed fortune inherited by Liliane from her family accounted for various of the real properties held in her name.

The judgment, as finally amended, determined that Kalif Trading was Charles' alter ego and was therefore responsible for the New Jersey judgment to the full extent of its assets. As for Liliane, the court's judgment provided that Goya could execute only against the following: (1) the proceeds of the Sutton House apartment Liliane had earlier owned in New York but since sold; (2) "any residence registered to her name, including the Fuengirola, Malaga, Spain villa, and the Paris apartment";[3] and (3) the stock of Emperor Equities, all of which was held in Liliane's name, and which the court directed Liliane to deposit with the court.

Charles, Liliane and Kalif Trading have now appealed from the district court's judgment. They contest the findings of fact and legal conclusions that led the district court to impose liability for the New Jersey judgment on property held in the name Liliane, Kalif Trading and Emperor Equities. They also contend that the statute of limitations and a contractual release debar Goya's claims and say that the district court

_____

[3]Fairly read, the judgment encompasses another New York apartment on Park Avenue which was the subject of evidence at trial and was held in Liliane's name at the time of the judgment. Apart from these three real properties, it is not clear what other real property held in Liliane's name at the time of the judgment was meant to be included.

-6-

committed various procedural errors.  We consider the merits of those arguments that have not been forfeited.

1. <u>Kalif Trading</u>.  It is easiest to begin with the district court's treatment of Kalif Trading, an off-shore company that Charles organized in 1979 and for which he and Liliane have had general power of attorney since incorporation. In November 1980, Charles transferred over $1 million to Kalif Trading in assets from his own securities account.  At about this time, he ceased to pay alimony to a former wife and also stopped paying taxes, claiming that he no longer had any income or assets.  In August 1983, Kalif Trading was also given title of a penthouse apartment in Puerto Rico previously held by Emperor Equities and apparently acquired with Charles' assets.

At trial, Charles claimed that Kalif Trading was owned by one Mohammed Kalif, but the court found that there was no evidence that Mohammed Kalif existed (he did not appear at trial), and that the company was a vehicle used by Charles to conceal his own assets.  This finding was supported not only by Charles' effective control of the assets, but also by his use of Kalif Trading's bank accounts to pay hundreds of thousands of dollars in bills for Charles and his wife, by the transfer of assets from Charles to Kalif Trading, and by the timing of Kalif Trading's creation.

In imposing liability on Kalif Trading, the district court applied New York law, after finding that Puerto Rico courts would apply a "most significant contacts" test, A.M. Capen's Co. v. American Trading & Prod. Corp., 74 F.3d 317, 320 (1st Cir. 1996), and that New York's contacts with transactions involving Kalif Trading were greater than those of any other relevant jurisdiction.  The brief filed for Liliane and Kalif Trading does not dispute the decision to apply New York law; Charles does so in his reply brief, but his arguments are terse, unpersuasive and too late.  Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 354 (1st Cir. 1992).[4]

Under New York law, the corporate veil may be disregarded where the challenger shows two facts:  (1) complete domination of the corporation by its alleged alter ego, and (2) use of that domination to commit a fraud or wrong against the plaintiff.  Morris v. New York State Dep't of Taxation & Fin., 623 N.E.2d 1157, 1160-61 (N.Y. 1993); see also New York v. Easton, 647 N.Y.S.2d 904, 908 (N.Y. Sup. Ct. 1995).  Although

---

[4]Panama, as the state of incorporation, may well supply the presumptively applicable legal regime for veil piercing claims; but under the Restatement rule, apparently followed in Puerto Rico, New York law could nevertheless be applied where, as here, Kalif Trading's business activities occurred primarily in New York and have no connection to Panama.  See Wadsworth, Inc. v. Schwarz-Nin, 951 F. Supp. 314, 320-21 (D.P.R. 1996) (citing Restatement (Second) of Conflict of Laws § 309 (1971)).

veil piercing is usually employed to make an individual or a corporate parent liable for the debts of a corporation, so-called "reverse piercing" (which makes the corporation liable for the debts of its owner or parent) is allowed under New York law where the assets at issue are held by the target corporation and the liability is that of the individual who dominates the corporation and is using it to perpetrate a fraud or wrong. <u>Wm. Passalacqua Builders, Inc.</u> v. <u>Resnick Developers S., Inc.</u>, 933 F.2d 131, 138 (2d Cir. 1991).

It may be open to dispute whether Kalif Trading was initially formed for the purpose of shielding assets from Goya. Although the district court's decision so suggests, New York law requires "clear and convincing" evidence of such fraud, <u>Lowendahl</u> v. <u>Baltimore & Ohio R.R. Co.</u>, 287 N.Y.S. 62, 76 (N.Y. App. Div.), <u>aff'd</u>, 6 N.E.2d 56 (N.Y. 1936), and such evidence seems lacking because Kalif Trading's formation and the transfer of Charles' assets to it took place after Charles' original litigation with Goya had been settled (in 1972 and 1974) and before Charles made his 1987 claim for a share of his parents' estate.

Nevertheless, even if Kalif Trading's origin is not tainted by fraud, New York still permits veil piercing where the corporate vehicle is being used to inflict "wrongful or

-9-

inequitable consequences."  <u>TNS Holdings, Inc.</u> v. <u>MKI Sec. Corp.</u>, 703 N.E.2d 749, 751 (N.Y. 1998).  New York courts have held that this test can be satisfied when a corporation is "a mere shell dominated and controlled by another for the latter's own purposes."[5] <u>Guptill Holding Corp.</u> v. <u>New York</u>, 307 N.Y.S.2d 970, 973-74 (N.Y. App. Div. 1970), <u>aff'd</u>, 292 N.E.2d 782 (N.Y. 1972), is inapposite here because, given Charles' denial of ownership of Kalif Trading, there is no easy way for Goya to levy directly on Charles' formal ownership interest in Kalif Trading.

There is ample proof that Kalif Trading is effectively the alter ego of Charles--who created it, initially funded it with his own assets, managed it, and paid his own and his wife's expenses with its assets.  Whether or not it was originally created to shield assets from creditors, it is not a business separate from Charles, and there is no indication it has any owners other than Charles.  It appears to us, as to the district court, to be nothing other than Charles himself under another name, and therefore under New York law it is permissible to strip away the corporate fig leaf.

_____

[5]<u>888 7th Ave. Assocs. Ltd. P'ship</u> v. <u>Arlen Corp.</u>, 569 N.Y.S.2d 16, 17 (N.Y. App. Div. 1991); <u>see also</u> <u>National Union Fire Ins. Co.</u> v. <u>Bodek</u>, 705 N.Y.S.2d 42, 43 (N.Y. App. Div. 2000); <u>Austin Powder Co.</u> v. <u>McCullough</u>, 628 N.Y.S.2d 855, 857 (N.Y. App. Div. 1995).

-10-

2. <u>Assets in Liliane's Name</u>. The claim as to Liliane's assets is more complicated. In 1968, Liliane and Charles took joint title to an apartment in San Juan, Puerto Rico, and in 1971, during the earlier round of litigation between Charles and Goya, the title to the apartment was transferred to Emperor Equities, Inc., a Delaware corporation wholly owned by Liliane. During and after 1972, the year in which Charles received the first installment of payments from Goya, Liliane and Emperor Equities developed a pattern of real estate acquisitions in which they obtained title to other luxury residences in Puerto Rico, New York, France, and Spain.

At trial, Liliane claimed that these properties had been acquired with assets provided by her once wealthy Bulgarian family. However, the district court concluded that this story was untrue, being uncorroborated and inconsistent with other evidence. It also concluded that the properties in question had been purchased by Charles, who used and enjoyed all of the residences "and in many occasions referred to them as his own in letters to third parties." <u>Goya Foods</u>, 982 F. Supp. at 112. In substance, the court found that Charles was "hiding his assets in the name of his wife for the purpose of impairing his creditors." <u>Id.</u>

Liliane's brief makes no persuasive attack on the district court's findings, which we find were adequately supported. Rather, the brief concentrates its criticism on the district court's theory of liability. Because the district court described Liliane as Charles' "alter ego" in relation to the acquisitions, Liliane says that the district court wrongly applied to a human being a theory that is only valid in relation to corporations. See, e.g., Werner-Jacobsen v. Bednarik, 946 P.2d 744, 747-48 (Utah Ct. App. 1997) ("An individual cannot be the 'alter ego' of another."). Further, says Liliane, property held in her name belongs to her "even if it were assumed that Liliane obtained her properties with Charles' money and not with her own . . . ."

The district court's use of the "alter ego" language to describe the relationship between Charles and Liliane may be inapt--no New York decision appears to use it in such circumstances--and in New York the property of one spouse certainly is not automatically subject to seizure for the debts of the other spouse. But New York courts have used the equitable theory of "constructive trust" to allow a third-party creditor to execute judgment on assets nominally owned by someone other than the debtor but, based on the court's

-12-

findings, actually owned by the debtor himself.[6]  It appears to us that, in using the alter ego language, the district court meant only that the properties in question were Charles' property but were merely held in his wife's name.

In some circumstances, even an intended transfer of ownership can be set aside.  For example, if a specific transfer from one spouse to another were made without consideration to defraud a creditor, a different set of New York doctrines ("actual or constructive fraud") could be invoked, see Scola v. Morgan, 412 N.Y.S.2d 893, 895 (N.Y. App. Div. 1979); 30 N.Y. Jur. 2d Creditors' Rts. & Remedies §§ 300-71 (1997); but in this case there are no detailed findings with respect to each of the individual transactions at issue that would establish fraudulent intent, see In re Montclair Homes, 200 B.R. 84, 96 (E.D.N.Y. 1996), or constructive fraud, see N.Y. Debtor & Creditor Law §§ 273-75 (McKinney 1990), nor did the district court purport to make such findings.

However, under the theory of constructive trust, no such specific findings are required if the purchases were with Charles' own funds, the transfers of title to Charles' wife

---

[6]Duncan v. Laury, 292 N.Y.S. 138, 139-41 (N.Y. App. Div. 1937); cf. Tesmetges v. Tesmetges, 47 B.R. 385, 390-91 (E.D.N.Y. 1984).  See generally Latham v. Father Divine, 85 N.E.2d 168, 170 (N.Y. 1949).

Liliane were merely nominal, and the parties intended that Charles continue to possess beneficial ownership of the properties.  See Bankers Sec. Life Ins. Soc'y v. Shakerdge, 406 N.E.2d 440, 440 (N.Y. 1980).  This, in substance, is what the district court found.  It does not make Liliane personally liable for her husband's debts; but it does mean that the property which he beneficially owns but which happens to be held in her name can be reached through the constructive trust doctrine for the benefit of his creditors.

Here, the circumstantial evidence of an implicit understanding is strong.  The timing of the transactions in relation to prospective litigation, Charles' continued treatment of the properties as his own, the parallels to the deceptive operation of Kalif Trading, and the inferences to be drawn from Liliane's baseless claim that the properties were paid for with family funds all contribute to the conclusion that the real estate in question was Charles' and not Liliane's.  Given that Charles and Liliane's "agreement" could be inferred from the circumstances, see In re Estate of Knappen, 655 N.Y.S.2d 110, 111-12 (N.Y. App. Div.), cert. denied, 683 N.E.2d 335 (N.Y. 1997), there is enough to sustain the district court's assessment of the situation under a clear error standard.

Two New York cases, not cited by the parties, make clear that a constructive trust is not automatically justified to undo a property transfer between spouses even when the purpose of the transfer (in each case, one involving the marital residence) is to protect against present or future claims by the creditors of the transferring spouse.[7] However, those cases are distinguishable, for they involved what the New York courts found to be genuine transfers that occurred without an understanding between the parties that the property would remain that of the transferring spouse. In our case, by contrast, the thrust of the district court's findings is that ownership was conveyed in name only.

This lack of an effective conveyance (and the resulting applicability of constructive trust theory) also answers the argument of Charles and Liliane that the statute of limitations bars the effort to reach property held in Liliane's name. Although the New York statute of limitations requires that suit based on fraudulent conveyance be brought within six years of the transfer or two of discovery (actual or constructive) of the fraud, Wall St. Assocs. v. Brodsky, 684 N.Y.S.2d 244, 248 (N.Y. App. Div. 1999), that is not the theory of recovery. In the

---

[7]Macina v. Macina, 455 N.E.2d 1258, 1259 (N.Y. 1983), aff'g 463 N.Y.S.2d 43 (N.Y. App. Div. 1983); Rossignol v. Silvernail, 635 N.Y.S.2d 772, 773 (N.Y. App. Div. 1995).

-15-

case of a constructive trust, the limitations period (six years, Maric Piping, Inc. v. Maric, 705 N.Y.S.2d 684, 685 (N.Y. App. Div. 2000)) begins to run only when "the wrongful withholding" occurs, Augustine v. Szwed, 432 N.Y.S.2d 962, 965 (N.Y. App. Div. 1980); accord Whalen v. Gerzof, 564 N.E.2d 656, 657 (N.Y. 1990), and the original date of transfer is not relevant.

The district court's rationale justifies its judgment to the extent that it recognizes Goya's right to execute against the _identified_ real property held in Liliane's name, specifically, the three named properties in New York, Paris, and Malaga. However, despite its broad literal wording, Goya Foods, 982 F. Supp. at 112, we do not construe the district court judgment as extending to any residence held in Liliane's name that has not yet been identified in this litigation. The constructive trust doctrine cannot easily be applied to property whose identity and circumstances of acquisition are unknown.

3. Emperor Equities. Next, we consider the various issues raised by Liliane's ownership of Emperor Equities. One set of the real properties at issue were three condominium apartments in Puerto Rico. One was acquired by Charles in 1968, title being taken in the joint names of Charles and Liliane; in 1971, during Charles' litigation with Goya, this property was transferred to Emperor, a corporation whose sole shareholder was

-16-

Liliane. Two further condominiums in San Juan were acquired in 1972, after Charles received a large initial payment from Goya. They too became properties of Emperor. One was transferred in 1983 to Kalif Trading, but the other remained in Emperor's name until being sold to a third party in 1991.

Despite its involvement in Charles' and Liliane's real estate transactions, Emperor was not named as a defendant in Goya's district court action seeking to reach assets of Charles held in the names of third parties. Liliane says that this is because Emperor was a Delaware corporation and, as this was also true of Goya, naming Emperor as the defendant would have destroyed diversity jurisdiction. Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267 (1806). Liliane says that it was an error for the district court to order Emperor, a non-party to the litigation, to forfeit its property, since Emperor was not itself a party to the case.

The short answer is that the district court judgment did not purport to reach properties held by Emperor at all. Instead, as clarified by the amended judgment of December 14, 1998, the district court directed that the "stock certificates and shares" of Emperor held by Liliane (it is unclear why both words were used) should be deposited with the court so that they could be used to satisfy the judgment. Such a judgment was

-17-

within the district court's power, for Liliane was a party to the case, and reaching securities that she owns does not require that the securities' issuer be a party.

4. Miscellany. There remain two other arguments of importance. First, in his opening brief on appeal, Charles claims that, in seeking to enforce the New Jersey judgment, Goya overlooked a procedural precondition. Since the New Jersey judgment was not initially entered by another federal court, it could not merely be registered in the federal district court in Puerto Rico under 28 U.S.C. § 1963 (1994). Rather, enforcement was governed by Fed. R. Civ. P. 69(a), providing that federal proceedings to enforce any out-of-state judgment of a state court should follow the practice of the state in which the federal district court sits.

Charles asserts that, under Puerto Rico law, for a foreign judgment to be enforceable in Commonwealth courts, it must first be validated and domesticated in an "exequatur" proceeding in the Superior Court of Puerto Rico. Ex parte Marquez Estrella, 128 D.P.R. 243, 247-56 (1991). This proceeding allows interested parties to raise certain limited defenses against the enforcement of a foreign judgment. Charles says that Goya failed to have the New Jersey judgment validated in this manner, that the New Jersey judgment was therefore "not

-18-

properly before the District Court," and that lack of an exequatur proceeding deprived Charles of his right to challenge validation of the judgment on the permitted grounds.

It may be (we take no position on the matter) that to enforce a state court judgment in the federal district court in Puerto Rico, there must be a prior exequatur proceeding[8] or some equivalent opportunity to challenge the non-Commonwealth judgment in the federal proceeding itself. However, Charles and Liliane first made their exequatur argument in July 1999, more than a year and a half after the district court had initially entered judgment against them. Thus, this argument was not made in a timely fashion, whether viewed as subject to the ten-day rule of Fed. R. Civ. P. 59(e) or the more relaxed one-year or reasonable-time restrictions of Fed. R. Civ. 60(b).[9]

The exequatur objection is not one that goes to the district court's subject matter jurisdiction and which might

---

[8]Compare Hibbs v. Yashar, 522 F. Supp. 247, 249-54 (D.R.I. 1981) (Rhode Island statute requiring preliminary judicial screening of medical malpractice cases), with Feinstein v. Massachusetts Gen. Hosp., 643 F.2d 880, 889 (1st Cir. 1981) (Massachusetts law requiring screening of medical malpractice claims by an administrative tribunal). See generally 19 Wright, Miller & Cooper, Federal Practice and Procedure § 4511 (1996).

[9]Neither of the amended judgments substantively altered the original judgment or provided any other excuse for the failure to raise the exequatur issue in timely fashion. See Berwick Grain Co. v. Illinois Dep't of Agric., 189 F.3d 556, 560 (7th Cir. 1999).

-19-

therefore be exempt from the ordinary requirements of timeliness. _See_ _Sea-Land Serv., Inc._ v. _Ceramica Europa II, Inc._, 160 F.3d 849, 852 (1st Cir. 1998). Nor, it is worth adding, is there any indication that Charles and Liliane were precluded from raising in the district court any substantive objections to the enforcement of the New Jersey judgment that might have been asserted in a Commonwealth exequatur proceeding. Charles did claim that the New Jersey court lacked jurisdiction to enter the judgment against him, but he did not pursue this issue on appeal in his opening brief, and it is therefore forfeited.

Second, Liliane claims that the district court erred by entering a default judgment against her and, later, by not affording her a jury trial even though the court ultimately allowed her to present her case on the merits. The district court entered a default against Liliane in March 1997 as a sanction for repeated failures to comply with court orders. Liliane's earlier demand for a jury trial was then struck on Goya's motion (no other party having made a timely request for a jury trial). Nevertheless, at trial the district court reversed field and allowed Liliane's counsel to offer witnesses and to present a defense, and it then resolved the claims against her on the merits. At no time during the trial did

Liliane offer an objection to the bench trial or ask the court to reinstate her jury trial request.

On this appeal, little need be said about Liliane's challenge to the original default. Although the remedy was severe, it followed obstreperous acts and clear advance warning from the district court, and it was not an abuse of discretion. Cf. Faigin v. Kelly, 184 F.3d 67, 84 (1st Cir. 1999); John's Insulation, Inc. v. L. Addison & Assocs., Inc., 156 F.3d 101, 108-10 (1st Cir. 1998). The more troublesome question is whether, insofar as the district court proceeded to try and decide Liliane's case on the merits, it should also have afforded her the jury trial she originally demanded. In posing this question, we assume dubitante that the original jury trial request was proper.[10]

Assuming that a right to jury trial otherwise existed, it was not preserved. Once the default was effectively withdrawn, Liliane could not proceed to present her case without telling the district court that she wanted the jury request

_____

[10]Imposition of a constructive trust is equitable in nature and, thus, may not trigger the right to a jury trial under the Seventh Amendment. See Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 40-42 (1989); RTC v. Pasquariello, 16 F.3d 525, 531 (3d Cir. 1994); see also Latham v. Father Divine, 85 N.E.2d 168, 170 (N.Y. 1949) ("[A] constructive trust is merely the formula through which the conscience of equity finds expression . . . ." (internal quotation marks and citations omitted)).

reinstated and then, after losing, complain that a jury should have been afforded. This kind of mouse-trapping, whether deliberate or inadvertent, is forbidden. Daigle v. Maine Med. Ctr., Inc., 14 F.3d 684, 687-88 (1st Cir. 1994). A claim to a jury trial can be forfeited just like any other non-jurisdictional request or objection.

Appellants present other arguments, including claims that personal jurisdiction over Charles and Liliane was lacking, that Charles was denied adequate discovery, that Charles was entitled to rely on Liliane's request for jury trial, that (according to Charles) New York law does not apply, and that misconduct by Goya warranted sanction and dismissal. However, all of these claims have been raised only in reply briefs, and it is well-settled that the attempt to present issues in this manner is untimely and that such claims therefore need not be considered. Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 354 (1st Cir. 1992).

Finally, the appellants argue that a 1974 contractual release given by Goya precludes Goya's present claims. This argument was admittedly not presented to the district court and is therefore forfeited in this court. It is doubtful that such a defense, if not seasonably asserted, could ever be rescued by

the plain error doctrine, but in any event there is no miscarriage of justice in its forfeiture here.

The appellants also have made, or at least insinuated, a variety of other arguments; to the extent these arguments are properly before us, we believe that they are without merit, and we reject them without detailed discussion. For the reasons stated, the judgment of the district court is <u>affirmed</u> with the clarification that insofar as the judgment permits Goya to levy against real properties held in Liliane's name at the time of judgment, it extends only to those real properties identified in the district court proceedings and not other unnamed properties. Appellants have pending a motion for reconsideration of our prior order striking various exhibits, and we now <u>deny</u> the motion to reconsider.

<u>It is so ordered</u>.